## Ex Parte W. H. McRae.

### No. 2813. Decided December 9, 1903.

**Habeas Corpus—Contempt of Court—Tampering With Juror—Evidence Insufficient.**

See evidence set out in the opinion upon which it is held that the court below was not legally authorized to fine relator for contempt of court for tampering with a juror. The bare effort to secure the services of a party to find out how a juror stands in reference to a case would not per se authorize punishment for contempt, unless the party so employed should make some effort to tamper with the juror or hold out some inducement to the jury to decide one way or another; or that he should talk with a juror about the case with a view of ascertaining how he stood in reference to the testimony.

From Bexar County.

Original application for habeas corpus directed to Hon. W. L. Davidson, presiding judge of the Court of Criminal Appeals, and which was granted by him in vacation and made returnable before the court in October.

Relator McRae was fined by Hon. J. L. Camp, judge of the Forty-fifth Judicial District Court, in the sum of $100, and was ordered confined in jail for contempt of court. Relator sued out his writ of habeas corpus which was granted by Presiding Judge Davidson in vacation and made returnable at the next October term of the court where the same was heard and determined.

The opinion states the facts so fully as to need no additional statement.

*Bell & McAskill,* for relator.

No briefs found in the record for respondent.

BROOKS, Judge.—Hon. J. L. Camp, judge presiding of the Forty-fifth Judicial District, fined relator McRae $100 and ordered him to be confined in jail for three days, for contempt of court. Relator sued out a writ of habeas corpus, which was granted by Judge Davidson in vacation, and made returnable before the court in October. From the agreed statement of facts, it is made to appear that on the morning of June 23, 1903, the case of Kraus v. San Antonio & Aransas Pass Railroad Company was called for trial in Judge Camp's court, in the city of San Antonio; and the jury was impaneled about 11 o'clock of that morning; and that Thomas and Fowler were jurors in that case, and lived at Elmendorf. J. C. Hopwood testified that he was constable at Elmendorf, and had known relator McRae about fifteen years; that he met McRae on Tuesday morning about 9 o'clock, and passed the time of day: "that McRae told me there was an Elmendorf man up here on the jury; did not tell me his name. He did not ask me any other questions at that time. * * * I next saw McRae between 11 and 12 o'clock that same day, in the corridor of the courthouse, by the side of the elevator. * * * I said to McRae, 'there are two men from Elmendorf on the

jury.' I had been in the courtroom and saw Fowler and Thomas on the
jury. * * * I said to McRae, 'Well, well, there are two men on
the jury from Elmendorf,' and he said: 'What kind of men are they;
do you think they would give a big verdict against a railroad just be-
cause it was a railroad?' and I told him I didn't think they would.
I told him they were good straight men, and would do what they
thought was right. And I told him I would be willing to take either
one or both of them on any case against me, either civil or criminal.
McRae asked me how I was getting along—what I was making out of
my office. And I told him there was but little in it, and commenced
talking about the railroad again. He told me there was a man up, there
asking for damages and he did not believe he was entitled to any, be-
cause he did not believe he was hurt; and he said, 'Do you believe they
would give him a verdict because he was a poor man?' And I said I
don't think they would; and I told him I thought many times the rail-
road did get gouged, but that they had always treated me very well and
gave me a pass between Elmendorf station and San Antonio; and Mr.
Stevens had just told me they settled for a horse all right without any
trouble, and I thought sometimes they got imposed upon. I agreed with
him that sometimes they had been imposed upon. He said this man
(Kraus) was trying to impose upon the railroad. He further said that
maybe he could help me out with the railroad company; he might get
me a pass good from one end of the road to the other; and if he could
do so he would, and might help me out a little financially; it might
not be very much per month, but might be enough to help me out.
He said, 'You are living right there and you might be able to help the
company out a little in these claims when they have anything at stake, by
calling on the witnesses.' There was nothing else said between McRae
and myself at this time. This was about 12 o'clock on Tuesday. I
did not see McRae again that day. The next time I saw him was on
the 24th, near John Dolan's saloon, about dinner time. * * * I
asked him, 'Are they through with that case up there yet?' and he said,
'I do not know; no, I think it will take them all the evening; they are
off for dinner.' And he said, 'You see those two jurors from Elmendorf;
keep your eyes open and see how they stand, and find out all you can and
let me know; I will see you at 2 o'clock.' There was no other conversa-
tion between McRae and myself at that time. I saw these two jurors
after that. I was sitting in those chairs in front of the Southern Hotel,
and there were three chairs pretty close together, and I sat down in
one chair that was empty, and Mr. Austin White was sitting in an-
other, and a gentleman in the other I did not know. Somebody touched
me on the back. It was Mr. Fowler, and he said: 'Hello! what are
you doing up here smoking cigars?' And I said, 'I guess you can smoke
cigars just as you smoke Mexican cigars.' That was the Mr. Fowler
on the jury. He also inquired about the health of a lady here. He
never mentioned the case on trial to me and I never mentioned it to

him. I asked him when he was going home, and he said he thought he would be here a week. * * * I did not see McRae at 2 o'clock; but saw him after 2. Before I saw him I had been up to the court-room and reported this conversation to Judge Camp. I saw McRae after that, and he said it was reported that I had accused him of trying to get me to tamper with jurors; and he said. 'You know I didn't do that, I just told you to keep your ears open; I just told you that as a friend.' "

Relator McRae testified that he was in the employe of Captain Napier, of the San Antonio Traction Company, as a sort of private detective around the courthouse watching cases on trial and boosters; and some-times, "by request of McCluskey, would watch a little for the Southern Pacific," etc. That he was around the courtroom off and on during the trial of Kraus v. San Antonio & Aransas Pass Railway. He tes-tified: "I met Hopwood three or four times Monday and Tuesday; met him in passing. I never stopped at any time to engage him in conversa-tion. I met him the first time in the aisle down by the elevator, on Tuesday, I believe. The next time I met him to speak with him was Tuesday about 12 o'clock, in front of Dolan's saloon. I was in con-versation with a couple of friends, and Hopwood walked up, and said, 'Hello, Will,' and I said, 'Howdy, Joe; are you here yet?' And he says, 'I don't know when I will get off.' And I says, 'Is that case still going on?' And he said, 'They have not finished it; it will possibly consume all the afternoon.' I said, 'What do you think about it, Joe? I have seen you up there a good deal sitting around listening to all the evidence?' And he said, 'I have not heard it all, and don't know what to think about it.' And I said, 'Can you count on these two men from Elmen-dorf; are they honest and reliable men?' I says, 'While you are stand-ing around here, keep your ears open and see what you can hear.' And I turned round to go home, and my brother came by about that time and asked me if I was ready to go; and I said, 'Not for a few minutes;' and I started to walk off, and he says, 'What time are you coming back?' Hopwood says to me, as I started to walk off, 'What time are you coming back?' And I said, 'I don't know, possibly 2 or 3 o'clock.' And my friends and I walked off. * * * When Hopwood made the state-ment to me that these men were both good men, I said, 'That is all the railroad wants—is honest men.' * * * I did not ask Hopwood to meet me at 2 o'clock. * * * I did not state to Hopwood, in the corridor of the courthouse, that I could help him down at Elmendorf, or get the company to help him by looking after their witnesses and claims, and it would be some little money for him every month. I noticed he came back and forth quite frequently, and I said, 'Do you have to pay fare over the road?' and he says, 'No, I have a pass;' and I says, 'Well, that's good; that saves you a right smart on the many trips you have to make. And I said there might be several little things around the depot at Elmendorf, such as Mexicans, on their property, and you

could kind of watch out for it, and possibly they would compensate you for anything you did. I had reference to the San Antonio & Aransas Pass. I was not a representative of that Aransas Pass, and had no connection with them whatever. * * * I said to Hopwood, 'While you are around, keep your ears open and see if you hear anything.' I thought possibly some of them would go around talking, some of these agents, and if he was standing around he could hear if any attempt was made or any proposition made to influence them, and if he heard any improper question or remarks he could inform me; I mean either to these jurors or any of them."

We do not think this testimony legally authorized the court to fine relator for contempt. We do not understand the authorities go to the extent of holding that the bare effort on the part of relator to secure the services of a party to find out how a juror stands in reference to a case then on trial, would per se authorize punishment for contempt, unless the party so employed by relator should make some effort to tamper with the juror, or hold out some inducement to the juror to decide one way or the other, or should talk with the juror about the case with the view of ascertaining what position he occupied in reference to the testimony. It must be conceded, that the conduct of relator was reprehensible, but we can not find any decision of any court of last resort authorizing the punishment of relator for contempt of court. We commend the trial court in the diligent effort he has manifested to maintain the purity of the administration of justice, and now enter our hearty disapprobation of the conduct of relator, and of similar efforts to in any way interfere with the due, decent and orderly administration of the laws of this State.

Because the conduct of relator does not bring him within any of the known rules authorizing this court to remand him for contempt, he is hereby ordered discharged from custody.

*Relator ordered discharged.*