UNITED STATES v. CARROLL.

(District Court, D. Montana, August 20, 1906.)

No. 1,156.

1. CONTEMPT—DIRECT CONTEMPT—ACTS IN IMMEDIATE VICINITY OF COURT.

A direct attempt by a person to bribe or persuade a witness to testify contrary to the truth in a cause pending and then on trial, or to influence the jury or any member thereof to find a verdict in favor of one party or the other, made on the street in the immediate vicinity of the court, constitutes a direct contempt, and the mere denial of the charge by the accused under oath is not sufficient to exonerate him, but the matter should be heard and determined upon all the testimony produced.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Contempt, §§ 32, 36, 37, 173, 187.]

2. SAME—MEASURE OF PROOF REQUIRED.

Accusations of contempt where of criminal import must be supported by evidence sufficient to convince the mind of the trier beyond a reasonable doubt of the actual guilt of the accused. and to establish every element of the offense including the criminal intent.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Contempt, §§ 185–187.]

3. SAME—ACTS CONSTITUTING—ATTEMPT TO INFLUENCE JURY.

A bare attempt, without success, to induce a third person to do what he could to influence jurors in a pending case in a federal court, did not obstruct the administration of justice, so as to constitute a contempt, punishable under Rev. St. § 725 [U. S. Comp. St. 1901, p. 583], under the rule that, to constitute such contempt, the act done by the accused must naturally and directly tend to such obstruction.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Contempt, §§ 36–40.]

Proceeding for Contempt.

Carl Rasch, U. S. Dist. Atty.

McBride & McBride and Edward Horsky, for defendant.

WOLVERTON, District Judge. While the case of the United States v. J. T. Carroll was pending, and on trial, the jury having been impaneled therein, the United States Attorney moved the court, based upon the affidavits of J. Miller Smith, Assistant United States Attorney, and one Palmer Paulson, that an order be made requiring one William C. Carroll to appear before the court on a day to be fixed, and show cause why he should not be punished for contempt. An order was accordingly made directing citation to issue, requiring the accused to appear on the afternoon of the same day at the hour of 2 o'clock, and show cause, if any existed, why he should not be punished as demanded. The motion was interposed, and the order made on the incoming of court at 10 o'clock in the morning. Carroll appeared in person, as well as by counsel, at the hour fixed, and first entered a plea of not guilty, but soon thereafter, with leave of court, withdrew such plea, and moved in open court to quash the proceeding. This motion was heard and denied, whereupon a demurrer was deemed to be interposed, which was likewise overruled, and a trial was had touching the merits of the alleged contempt, both the government and the accused calling and examining witnesses respectively in their behalf. The testimony being closed, counsel moved for a discharge of the citation and a dismissal of the defendant from further attendance upon the order of the court. Hearing was had upon the motion, as well as upon the merits of the controversy, and the matter taken under advisement. This briefly outlines what was done in court, and with what summary dispatch, if the term be appropriate, the cause was proceeded with, and the situation will readily be understood.

In order to gain a clear conception of the nature of the charge against Carroll, the material averments of the affidavits of the Assistant United States Attorney and Palmer Paulson should be further set out. The former asserts on information and belief that one William Carroll on the 11th day of August, A. D. 1906, at the city of Helena in said district of Montana, corruptly endeavored to impede the due administration of justice in the case of the United States v. Joseph T. Carroll, now pending in the District Court of the United States, in and for the district of Montana, in the following manner, to wit: That the said William Carroll on the 11th day of August, A. D. 1906, approached one George B. Hopkins, a resident and citizen of the city of Helena, state and district of Montana, and handed the said George B. Hopkins a paper containing a list of the names of the jurors impaneled to try said cause, and asked the said Hopkins if he was acquainted with A. Wiegand, one of the members' of said jury, and that if he had any other friends on said jury to use his influence with them for the benefit of said defendant, or words to that effect; and also stated to said Hopkins that he had other lists that he was handing around. The latter of the affiants avers in substance that he had been subpœnaed as a witness for the government in the J. T. Carroll case; that he met the said William C. Carroll on the morning of the 9th of August, 1906, on Main street in the city of Helena, in front of the Hub clothing store, at which time Carroll requested him to testify, contrary to the truth in said cause, that at the time affiant worked for

said Joseph T. Carroll upon the ranch and premises known as the "Carroll Premises," at and near what is known as "Jones' Gulch," the fences were down upon said premises during the time he so worked there.

At the trial, Mr. Hopkins, the person alluded to in the affidavit of the Assistant United States Attorney, testified, in substance, so far as it is material here: That he had been acquainted with William C. Carroll four or five days. That he met him on August 11, 1906, a few minutes before 6 o'clock in the evening, on Main street, in the city of Helena in front of Lockwood's drug store, and that he (witness) spoke to him first. That, at any rate, Carroll said: "Hold on. I want to ask you a question about a carpenter." "Come in here." And that they went into Sass's cigar store. That he (Carroll) then produced a paper, and looking at it said: "Do you know a man named A. Wiegand, a carpenter?" And witness replied: "I know of the man, but I am not acquainted with him personally. I am not well enough acquainted to speak to him on any ordinary matter." That Carroll looked at the paper again, and said: "Do you know any way that I can get at Oscar Carlson?" That witness replied: "I don't know. He is a pretty hard-headed Norwegian." That Carroll unfolded the paper, and said: "Do you know any of those names?" That witness looked at several of them, and replied, beginning at the top: "I think I know this man. I don't know that man. There is another man's name that I know; but he and I are not on very good terms." That witness read down three or four names that way; that Carroll started to fold up the paper, and that, out of curiosity, witness asked him to let him see it again; that Carroll opened it out, and that witness saw the names on it. That Carroll said: "Well, take this paper, anyway. I have others." And continued: "Now, Mr. Hopkins, if there is anything you can do for me in regard to this, I wish you would do it; and if you will do us the favor * * * we will remember it, and reciprocate it at any future time when necessary." The witness further testified that that ended the conversation; that he took the paper and put it in his pocket; that Carroll picked up a little grip that he had, and started off, saying, "I am off for Butte." That witness stopped him and asked: "Are you off for good?" And that he replied, "No; I think I will be back to-morrow night." Witness further testified that he did not know what the list of names appearing on the paper represented; that he has never been positively told the paper contained a list of the jury; that Carroll asked him about Oscar Carlson, but that he did not state his purpose; that when asked how to get at Carlson, witness answered: "I don't know. Oscar is a pretty hard-headed Norwegian." And being asked what the witness understood Carroll to refer to, when he stated that if witness could do anything for him or them, etc., he answered, over objection, that he had an idea from the start that this was a list of the jury in the J. T. Carroll Case; that that was his own inference, possibly, because Carroll never mentioned either jury or juryman to him. And further, a little later in the examination, the witness testified that his inference and impression during

this conversation with Carroll was that he (Carroll) was endeavoring by some means through witness to reach and create a favorable impression in favor of his brother with some one or more of the jurymen. It should be stated in this connection that both Wiegand and Carlson were upon the jury then impaneled in the J. T. Carroll Case. Upon cross-examination, the witness further testified that he did not ask to see the list; that the word "jury" was never mentioned; that Carroll and witness had had a general conversation in regard to the J. T. Carroll Case, about to come up, two or three days previous; that there was to be a retrial of the case; that he took the list from Carroll, because he had a curiosity to find out whether it was really a list of the jury or not; that at the time he concluded the talk with Carroll, he (witness) did not intend to do what Mr. Carroll gave him to understand he wanted him to do, and being asked: "And you never intended to do anything of the kind, Mr. Hopkins?" he answered: "No, sir; I never did." Witness further testified, as interrogated, as follows:

"Q. And there was nothing in his manner, in Mr. Carroll's manner, was there, Mr. Hopkins, in asking you to do this, or anything that he said or intimated, that was supposed to operate, or that operated sufficiently as a persuasive, to induce you to go ahead with this thing, or to have any intention to do it? A. No, sir. I had no intention to do it. ,Q. And there was no consideration of any kind offered at all to induce you to help him, other than your friendship? A. His last remark, when we parted, included a promise to return the favor. Q. And reciprocate, or a reciprocation of any courtesy you might extend to him, or do for him? A. Yes, sir. Q. Is that the idea? A. That is the idea."

Paulson testified in effect that he met William C. Carroll on the Tuesday preceding this hearing in Helena, Mont., near ·a store on Main street that he (witness) came out of. That Carroll talked to him there, and witness continued as interrogated, as follows:

"Q. What did he say? A. Well, he said, I didn't need to say the fences was closed. Q. That you need not say the fences were closed when you were working there? A. Yes. That is what he said. Q. What else did he say, if anything? A. That is all. Q. Had you testified in the case before, with reference to the fences being closed? A. Yes. Q. That was at the former trial, was it? At the first trial? A. Yes. Q. Now, then, you testified that the fences were closed? A. Yes, sir. Q. And he told you that when you testified again that you need not testify that the fences were closed? A. That is what William Carroll told me. Yes. That I need not testify that the fences was closed when I was working there."

On cross-examination the witness repeated that Carroll said to him: "Don't say the fences was closed when you was working there."

William C. Carroll testified that he met Hopkins on Saturday as he was getting ready to leave the city; that Hopkins stopped him and spoke first; that he asked witness how they were getting along with the case, and witness answered: "I can't tell; they have just finished with the ·jury." That Hopkins asked witness if he knew the jury, and that witness told him he did not know a man on it; that Hopkins then asked him if he had a list of the jury; that witness did not remember at first whether he had a list or not, but that he felt in his pocket, and found that he had such a list; that Hopkins asked him to let him see it; that he did not give any reasons for wanting to

see it; that he read it over, and said that it was a very good list of men, but that there were two men on there that he either said he didn't speak to, or they didn't speak to him; and that they talked in a general way. Witness further testified, as interrogated, as follows:

"Q. Did you ask him to influence the jury? A. I never mentioned it to him. Q. Did he ask you, or, rather, did you ask him anything about Wiegand? A. Wiegand? Q. Yes. A. No, sir. Q. Do you know the name? A. I do not, sir. Q. Did he tell you anything about Wiegand? A. No, sir. He never mentioned Wiegand's name to me. He asked me if I knew the jury, and I told him I didn't know, absolutely, a man on it, and I would not know a man on it now. I do not know a man on it now. The only time I ever saw the jury was when they went down from the court room, down the street, all in a body. * * * Q. Now, you heard the testimony of Mr. Hopkins to the effect that when you and he parted, you said to him, in effect, that if he did something for you, you would do something for him at some future time? A. That was absolutely false, sir. Q. Was there any occasion for your saying anything of that kind? A. No, sir. There was not."

Carroll further denied absolutely the statement of the witness, Paulson, and in this he is corroborated in a measure by another witness named Kinman, who claims to have been present at the time the conversation alluded to should have taken place.

It was strenuously urged by counsel for defendant at the final argument of the cause, upon the motion to discharge, as well as upon the merits, that if the transactions complained of constitute a contempt at all, it is an indirect or constructive contempt, and that the oath of the defendant denying positively and emphatically the culpatory allegations of the affidavits setting forth the contempt charged, although not interposed in the way of a formal answer, constitutes a complete defense to the proceeding under the practice, and, therefore, that it ought to be dismissed without further inquiry. Without seeking to ascertain what the proper practice applicable to the present controversy is, because of the lack of time to investigate the subject fully, it is sufficient to say that I am of the opinion that any direct attempt on the part of any person to bribe or persuade a witness to testify contrary to the truth in a cause pending and then on trial, or to influence the jury, or any member thereof, to find a verdict in favor of one party or the other, where made so near the court as is designated by the witnesses for the government, being not to exceed three blocks away, constitutes, in legal contemplation, a direct contempt; that is to say, it constitutes misbehavior so near to the court as to obstruct the administration of justice, and that the mere denial of the charge by the accused under oath will not serve to exonerate him. In such a case, the practice seems to obtain of hearing the cause in full upon the testimony, pro and con, and determining the guilt of the accused from all the testimony submitted, whether he refutes the charge under oath or not. See Ex parte McCown (N. C.) 51 S. E. 957, 2 L. R. A. (N. S.) 603, where is to be found an elaborate and able discussion of the subject in hand, and Ex parte Summers, 27 N. C. 149.

Hammond, Judge, in speaking of the power of the court to punish under the act of Congress, as prescribed by section 725 of the Re-

vised Statutes [U. S. Comp. St. 1901, p. 583], in United States v. Anonymous (C. C.) 21 Fed. 761–768, says:

"I do not find it necessary to go into the distinctions between direct and constructive contempts, which are so unsatisfactory to all who study this subject. There is always a struggle to relegate every contempt to the odious category of constructive contempts, in order to take shelter under these restrictive statutes. But I may say that in my judgment the courts will find that the Legislature has not taken away any valuable power, when these statutes are properly understood. Notwithstanding the seemingly formidable array of authority, it may be that, after all, it is a mistake to say that all contempts not committed in the presence of the court are constructive only. The mere place of the occurrence may not be an absolute test of that question, and it may depend on the character of the particular conduct in other respects besides the place where it happens. * * * Wherever the conduct complained of ceases to be general in its effect, and invades the domain of the court to become specific in its injury, by intimidating, or attempting to intimidate, with threats or otherwise, the court or its officers, the parties or their counsel, the witnesses, jurors, and the like, while in the discharge of their duties as such, if it be constructive, because of the place where it happens, because of the direct injury it does in obstructing the workings of the organization for the administration of justice in that particular case, the power to punish it has not yet been taken away by any statute, however broad its terms may apparently be.".

The case In re Brule (D. C.) 71 Fed. 943, covers the proposition I have made distinctly, which will be apparent from the reasoning of Hawley, District Judge, in the last paragraph of his opinion. He says:

"Now, from the reasoning of these cases, it is made perfectly clear that the misbehavior of which Brule is guilty, if it had occurred anywhere within the building where the court is held, would have been 'clearly a contempt, punishable as provided in section 725 of the Revised Statutes, by fine or imprisonment, at the discretion of the court, and without indictment. Why? Because, under such circumstances, it would have been misbehavior, of a person in the presence of the court. But the statute says that the misbehavior of a person so near thereto as to obstruct the administration of justice' may be likewise punished as a contempt of court. If it is a contempt to bribe a witness in front of the courthouse door, is it not a contempt to attempt to do the same thing on the street opposite the court building, or four blocks away? Is not the result the same? Is not the motive of the accused the same? What difference does it make whether the attempt was made on the ground owned by the United States, or at the residence of the witness in the same town, four blocks, or about one-quarter of a mile away, from the court building? In one case the misbehavior would be construed to be in the presence of the court, and in the other 'so near thereto as to obstruct the administration of justice,' and the statute, in clear language, is made to apply to both cases."

See, also, Ex parte McLeod. (D. C.) 120 Fed. 130.

It is, however, a principle very well settled that accusations for contempt, especially where of criminal import, must be supported by evidence sufficient to convince the mind of the trier, beyond a reasonable doubt, of the actual guilt of the accused, and every element of the offense, including the criminal intent, must be proved by evidence or circumstances warranting an inference of the necessary facts. United States v. Jose (C. C.) 63 Fed. 951; Sabin v. Fogarty (C. C.) 70 Fed. 482. In the latter case, Hanford, District Judge, says:

"A contempt case is one in which the court must be convinced beyond a reasonable doubt of the facts before finding a party guilty."

Bearing in mind these legal principles, I will proceed to a consideration of the facts disclosed by the evidence, and determine whether they involve the defendant in a contempt of court. The gist of Hopkins' testimony pertinent to the controversy is that Carroll asked him: "Do you know of any way that I can get at Oscar Carlson," who was a member of the jury then impaneled to try the case of the government against J. T. Carroll, his brother, the second time. Hopkins replied: "I do not know. He is a pretty hard-headed Norwegian." When they were about to separate, Carroll said: "Well, take this paper"—meaning the list—"anyway. I have others." And continued as follows: "Now, Mr. Hopkins, if there is anything you can do for me in regard to this, I wish you would do it; and if you will do us the favor * * * we will remember it, and reciprocate it at any future time when necessary." Hopkins never agreed to do anything for Carroll; nor did he receive any consideration for doing the thing requested, except a promise of reciprocation. Now the question resolves itself into whether this demeanor on the part of Carroll tended in any manner to obstruct the administration of justice. I have been referred to but one case having a direct bearing upon the condition involved. This I will allude to later. In treating of section 5399, Rev. St. [U. S. Comp. St. 1901, p. 3656], a cognate statute to section 725, the court in United States v. Bittinger, 24 Fed. Cas. 1149, No. 14,598, in its instructions to the jury, says of the first clause: "It contemplates a case in which an attempt is made to directly interfere with a witness, and to improperly and illegally influence him." And of the second clause: "It will be necessary for you to find that the defendant, Bittinger, did some act or acts which obstructed or impeded the due administration of justice." Thus giving the impression that the act complained of must have the direct effect, within itself, to obstruct or impede the administration of justice.

In a much later case, United States v. Seeley, 27 Fed. Cas. 1010, No. 16,248a, the court discusses directly the import of the words "obstruct" and "impede," as employed in the same section 5399. It says:

"To 'obstruct,' independent of the acceptation the word has obtained in the criminal law, would seem to stand ex vi termini a direct and positive interposition, which prevented, or tended to prevent, the action of the officer or court in respect to a matter then to be proceeded in. 'Impede' must necessarily bear a similar import, and, if there be any discrimination between the two terms, it can only be that the same direct and positive interference may, without amounting to a complete obstruction, become an impediment to the action intended to be intercepted. The intention of the Legislature to give these terms an application only to direct acts of violence or menace is inferrible from the construction that the endeavor is made equally criminal with the entire completion of the purpose. An endeavor to obstruct or impede, etc., by threats or force, would necessarily imply the effort to put forth some act, which in its natural, if not necessary, consequence, must be attended with an obstruction, and with a forced and compelled interruption of further progress in the administration of justice."

Thus again indicating that the act put forth must itself have the direct and natural effect to obstruct or impede. If this be so, then the act of Carroll in endeavoring to get Hopkins to do something for him, or his brother, with the jury, which Hopkins never consented to, could, of itself, have no direct or sensile effect to obstruct or impede the due administration of justice. It was an endeavor which in no way reached or influenced the jury, and, therefore, tended in no way to impede justice or the administration thereof. If the endeavor had been directly with the jury or a member thereof, then it would have reached the mark; but an effort to get a third person to act, who declined, stops short of a misbehavior that is effective to obstruct, or impede justice, or to hinder its administration.

The case of Ex parte McRae (Tex. Cr. App.) 77 S. W. 211, alluded to above, is apt; the facts being very similar to the one at bar, whereof the court says:

"We do not think this testimony legally authorized the court to fine relator for contempt. We do not understand the authorities go to the extent of holding that the bare effort on the part of relator to secure the service of a party to find out how a juror stands in reference to a case then on trial would, per se, authorize punishment for contempt, unless the party so employed by relator should make some effort to tamper with the juror, or hold out some inducement to the jury to decide one way or the other, or should talk with the juror about the case with the view of ascertaining what position he occupied in reference to the testimony."

In this view of the law, which I feel constrained to follow, the endeavor of Carroll made with Hopkins to have him use his influence with the jury, for the purpose indicated, did not constitute a contempt punishable under section 725, Rev. St., which defines and limits the power of the court in the premises.

As to the alleged attempt to influence the witness Paulson, the testimony is too unsatisfactory upon which to find the accused guilty, beyond a reasonable doubt. Paulson was dull and sluggish in testifying, confining himself to merely asserting and reasserting, without stating intelligently any of the attending facts and circumstances, that Carroll said that he (Paulson) "didn't need to say the fences was closed." This, the defendant contradicted flatly, and with it there was some corroboration. I am unable to say, therefore, under the evidence, that defendant is guilty in the particular alleged by Paulson's affidavit.

Recurring again to the affair with Hopkins, I deem it proper to say further that I prefer to believe the testimony of Hopkins, as against that of the defendant, and I am firmly convinced that it was the purpose of Carroll to reach one or more of the members of the jury through Hopkins, if the latter could be had to serve his purpose. The act was willful, is vicious and reprehensible, and should be visited with appropriate punishment, but the court is unauthorized to mete it out in this proceeding.

The proceeding will therefore be dismissed, and the defendant discharged.