## CLARK v. UNITED STATES.
### No. 9457.

Circuit Court of Appeals, Eighth Circuit.
Oct. 20, 1932.

GARDNER, Circuit Judge, dissenting.

Sigurd Ueland, of Minneapolis, Minn., for appellant.

Fred Horowitz, Sp. Asst. to Atty. Gen. (Lewis L. Drill, U. S. Atty., of St. Paul Minn., on the brief), for the United States.

Before STONE, KENYON, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

This is an appeal from a judgment of the District Court entered on the 26th day of December, 1931 (1 F. Supp. 747), adjudging appellant, Genevieve A. Clark, guilty of contempt, and imposing as punishment confinement in the county jail of Ramsey county, Minn., for a period of six months and payment of a fine of $1,000. As we hereinafter fully discuss the facts, it will be necessary at this point merely to refer briefly to some of them.

Appellant on August 24, 1931, was summoned to report on September 1, 1931, as a juror in the United States District Court at St. Paul, Minn. The case for which she was summoned was that of United States v. W. B. Foshay, Palmer V. Mabry, et al., a somewhat celebrated mail fraud case (which will be referred to hereinafter as the Foshay Case[1]). She did not know at the time of the summons for what particular case she was called. Within a day or two after the receipt of the summons she telephoned her sister, who worked in the Federal Building at St. Paul, about being called on the jury, and discussed with her the question of postponement of her service on account of expecting a friend to visit her during the week of September 1st. In one of the telephone conversations with her sister she was advised that the case she

[1] Jury trial with no opinion by court.

was called upon was the Foshay Case. She was also advised by her sister that she would probably be disqualified because she had been employed by Foshay Company, a corporation in which a number of the defendants were interested. Appellant had been married to one D. D. Clark in January, 1921. He was president of the Citizens' State Bank of St. Paul from January, 1921, until August 1925, when at the request of the State Banking Department he agreed to resign. Prior to her marriage she had been employed in the bank as a stenographer, and so continued for a time after her marriage. Appellant had been employed by the Foshay Company for some two weeks in the summer of 1929. She was not acquainted with any of the defendants. In the years 1922 and 1923 her husband had some business transactions with defendant W. B. Foshay. The record contains a number of letters written back and forth between Foshay as president of the W. B. Foshay Company, and her husband as president of said Citizens' State Bank, which show rather intimate business relations between them. Her husband at the time of the trial was a member of the real estate firm of Willie & Clark, having left the service of the bank some time previous thereto. One of the defendants, Mabry, transacted business with said Citizens' State Bank from 1917 until 1925, and was acquainted with appellant's husband. Prior to appellant's examination on the voir dire she talked with some women who were also summoned for service on the panel. These women testified on the hearing for contempt that she made statements that she wished to serve on the jury and that she had a special reason for wanting so to do, and was afraid that her former employment by the Foshay Company would disqualify her. Judge Molyneaux conducted the examination of the jurors on the voir dire, and appellant during said examination was asked questions and gave answers as follows:

"Q. Have you yourself ever been in any business of any kind? A. I have been a stenographer before my marriage, yes.

"Q. In what kind of business did you work? A. Well, I did some banking, and some real estate and insurance, and I was with an automobile concern, with a Nash agency."

She testified further that after the summons she discussed with her husband the probability of being on the jury; that she had formed no opinion thereon and did not know the lawyers of defendants. The following also occurred on this examination:

"Q. Well, do you feel that you are now—

that your mind is now open and free, and that you are not biased either one way or the other? A. Yes, I do feel that way.

"Q. Did you ever sit on a jury before? A. No, sir.

"Q. And you think, in the trial of this lawsuit, you could follow the evidence, or would try to follow the evidence, and base your judgment on that and the law as given to you by the Court? A. Yes, I do."

She was accepted and sworn as the final juror.

Evidence was introduced in the contempt hearing by other jurors as to her conduct in the jury room, and certain statements she made before the jury when it was deliberating, on the theory that they tended to show bias and prejudice at the time of her examination. We refer to them hereinafter. Appellant's husband visited her about once a week during the course of the trial before the jury retired to consider its verdict. She claims to have talked to him only while Mrs. Henderson, a bailiff, was present. Mr. Clark did not testify in the present hearing. She expressed a desire before the jury to talk to her husband, that "she would like to have his opinion—how he would vote." In the jury room she discussed the evidence but little.

The trial of the case lasted about seven weeks. The jury was out approximately one week, being discharged on October 23, 1931. It stood from the commencement of its balloting eleven for conviction and one (appellant) for acquittal. The government instituted an investigation of the circumstances surrounding this trial under which appellant became a member of the jury. On November 3, 1931, Mr. Horowitz, counsel for the government, Post Office Inspectors Schriver, Simmons, and Hugdal, and the court reporter, Mr. Ackerman, called upon appellant and her husband at their home. Stenographic notes of what transpired were taken, and were used on the cross-examination of Mrs. Clark.

On November 4th a petition was filed in the District Court charging appellant with criminal contempt, and a rule to show cause was issued thereon returnable November 9, 1931. On that day appellant filed a sworn answer denying the charges of the petition for the rule. Additional time to prepare for trial was asked, but the court proceeded to hear witnesses on behalf of the government, and then granted a continuance for ten days to enable appellant to prepare her defense.

The case was heard by two District Judges, Sanborn (now Circuit Judge) and Nordbye. A written opinion was filed in which the court said: "The evidence does conclusively establish that Mrs. Clark, at the time of her examination, did have in mind that she had worked for the Foshay Company in the summer of the year 1929. She had been informed by her sister that that fact would probably disqualify her as a juror in that case. Her discussion with other prospective jurors clearly indicates that she herself was apprehensive that such employment would prevent her from being accepted as a juror. We are convinced that she deliberately and intentionally concealed her association with the Foshay Company when she was examined by the court."

Also as to her answers concerning freedom from bias and prejudice: " * * * It is our opinion that Mrs. Clark purposely withheld information from the Court so as to be accepted as a juror. Her remarks to her fellow prospective jurors as to her desire to be accepted on the panel and that she had a special purpose in mind, may without any other circumstances, be quite consistent with an honest rather than a wicked intent. Her studied attempt, however, to get on the jury, her evasive and incomplete answers, coupled with her conduct after she was accepted, convince us that her mind was prejudiced by some person, or for some reason, before she took her oath as a juror."

It is the contention of appellant that she has been convicted of something claimed to constitute contempt, of which she was not accused; that she was charged with perjury and the same was not proved; that the court misapprehended the nature of contempts; that the court erred in receiving evidence of deliberations in the jury room; erred in permitting cross-examination of appellant in respect to what she said and did in the jury room; that it was denial of due process of law to proceed to trial on the return day; that the sentence is excessive; that it was error to sentence appellant to both fine and imprisonment.

It thus appears that many important questions are raised by the assignments of error.

Counsel for appellant in his brief states: "The startling fact is that appellant has been convicted of something claimed to constitute a contempt of which she was not accused." The seriousness of this charge challenges our first attention.

We agree with the argument of counsel that the contempt, if any, was what the law

regards as a "constructive" contempt, rather than a "direct" one.

◼ The alleged contempt, while within the presence of the court, could not be known to the court in its judicial knowledge or observation, and hence there could not be summary punishment. The proceeding here was the proper one, and due process of law entitled appellant to be informed of the alleged contempt and of what it consisted, and to a reasonable opportunity for preparation of her defense; also to be represented by counsel and to immunity from self-incrimination. Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 69 L. Ed. 767. Contempt proceedings have many times been said by the courts to be sui generis. The accusation does not require the same particularity as an indictment. It is sufficient if it fairly advise an alleged contemnor of the offenses with which he is charged so as to enable him to prepare properly his defense thereto. In Aaron v. United States, 155 F. 833, 836, this court said: "It is now the recognized rule that the information in a contempt proceeding is sufficient if it clearly apprises the defendant of the nature of the charge against him, and no particular form is necessary." In Myers v. United States, 264 U. S. 95, 44 S. Ct. 272, 273, 68 L. Ed. 577, the court said: "contempt proceedings * * * are sui generis—neither civil actions nor prosecutions for offenses, within the ordinary meaning of those terms." The cases cited by plaintiffs in error in support of this contention deal with indictments in criminal cases and are not in point. There is no fixed formula for contempt proceedings, and technical accuracy is not required. In Ex parte Grossman, 267 U. S. 87, 117, 45 S. Ct. 332, 336, 69 L. Ed. 527, 38 A. L. R. 131, the court said: "Contempt proceedings are sui generis because they are not hedged about with all the safeguards provided in the bill of rights for protecting one accused of ordinary crime from the danger of unjust conviction." In Kubik v. United States, 57 F.(2d) 477, this court recognizes and approves the doctrine that in contempt proceedings the information is sufficient if it clearly informs defendant of the charge, and in a recent opinion, Conley et al. v. United States, 59 F.(2d) 929 (filed May 25, 1932), this court sustains an information for contempt less informative than the one here under discussion. See, also, Armstrong v. United States (C. C. A.) 18 F.(2d) 371; In Savin, Petitioner, 131 U. S. 267, 9 S. Ct. 699, 33 L. Ed. 150; Ex parte Hudgings, 249 U. S. 378, 39 S. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333; Hagner v. United States, 285 U. S. 427, 52 S. Ct. 417, 76 L. Ed. 861.

◼ The entire record may be examined by a reviewing court to determine whether an alleged contemnor has been sufficiently informed of the charges against him. Schwartz v. United States (C. C. A.) 217 F. 866; Blackmer v. United States, 60 App. D. C. 141, 49 F.(2d) 523; Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874.

◼ Was appellant here sufficiently advised of the charges against her? Of course from the questioning of her husband and self by government officers before the accusation was filed she knew that her conduct as a juror was being investigated, and that she was being accused of falsification in her answers to questions put to her by the District Court; but what did the petition for the rule which was served upon appellant tell her? It charged that she willfully, corruptly, and contrary to her oath, did falsely swear and depose before said court in answer to questions put to her by the presiding judge in the criminal indictment trial against the defendants, Foshay et al. It called especial attention to her answers as to her being in business before she was married, and that her mind was free and open, that she was not biased either one way or the other and would base her judgment on the law and evidence as given by the court. It then stated:

" * * * Whereas, in truth and in fact it was not and is not true and at the time of so swearing and deposing the said Genevieve A. Clark did not believe it to be true that she, the said Genevieve A. Clark, had been in business but that was before she was married and that she had been a stenographer working as such in the banking, insurance and real estate business and with a Nash automobile agency, and that it was true that since her said marriage she was employed by the said Citizens State Bank of St. Paul, and other concerns, and as late as July, 1929, was employed by the said W. B. Foshay Company, a corporation; * * *

."And whereas, in truth and in fact it is not true and at the time of said swearing and deposing the said Genevieve A. Clark did not believe it to be true that her mind was free and open; that she, the said Genevieve A. Clark, was not biased either one way or the other and would try to follow the evidence and would base her judgment on the evidence and the law as given by the Court; and that it is true that her mind was not free and open and that she was biased and would not try

to follow the evidence and base her judgment on the evidence and the law as given to her by the Court in that she was determined at the time she did so swear and depose that regardless of the evidence and the law that she would vote not guilty as to each and all of the defendants."

And the petition further asserts: "And the said Genevieve A. Clark, in the manner and form aforesaid, having taken an oath before a competent tribunal in a case wherein the law of the United States authorized an oath to be administered that she would truly depose and testify, wilfully and contrary to her said oath, did depose and state material matters which she did not then believe to be true and did then and there commit wilful and corrupt perjury; and the due administration of justice, in the selection of a jury, and in the trial of said Foshay case in this Honorable Court was in fact thereby corruptly and unlawful impeded and obstructed." It then prays that she be required to appear to show cause "why she should not be held in contempt of this Honorable Court in consequence of her said contemptuous and obstructive conduct, and punished by fine or imprisonment as for criminal contempt * * *."

The rule required her to appear and show "why she should not be adjudged in contempt of the authority of this Court as prayed in said petition."

There is no real difference between the statement she was accused of making, "That she, the said Genevieve A. Clark, had been in business, but that was before she was married;" and the statement the evidence says she actually made, "I have been a stenographer before my marriage, yes," which was in answer to the question, "Have you yourself ever been in any business of any kind?"

■■ Appellant argues that she was charged with perjury, that perjury was not proved, and hence the government has failed in its proof. It is true the petition charges her with perjury, and we may assume that what she did may not amount to perjury; but she was accused of "contemptuous and obstructive conduct," so that even if the conclusion of the accusation was that perjury was committed, it is obvious that all the facts were stated upon which was based a charge of contempt.

The general rule as to proof of perjury as laid down by the Supreme Court in Hammer v. United States, 271 U. S. 620, 46 S. Ct. 603, 70 L. Ed. 1118, and other cases, makes most difficult its successful prosecution.

The government here elected to proceed for contempt and not for perjury—doubtless having in mind the difficulty of conviction of perjury.

The essence of the offense charged was contempt rather than perjury, and as falsification or evasion which may fall short of perjury may constitute contemptuous conduct if its tendency is to obstruct the administration of justice, the allegation of the petition that appellant's answers constituted perjury is an immaterial allegation, and she stands thereunder charged with the exact offense of which she was convicted.

■ The gist of criminal contempt is the obstruction of the administration of justice. The gist of perjury is falsification under oath.

In Ex parte Hudgings, 249 U. S. 378, 39 S. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333, it was held that technical perjury does not constitute criminal contempt within the meaning of section 268 of the Judicial Code (28 US CA § 385) unless it amounts also to an obstruction to the administration of justice, and impliedly it can be drawn from that case that less than technical perjury may constitute criminal contempt if it amounts to an obstruction in the administration of justice even though certain elements of perjury be lacking. In People ex rel. Nunns v. County Court of Nassau County, 188 App. Div. 424, 176 N. Y. S. 858, 870, the court said: "I perceive no logic in the proposition that the commission of perjury is essential to a contempt by false answers." In Young v. State, 198 Ind. 629, 154 N. E. 478, 479, the court said: "Ordinarily, false swearing by a witness is held to be such an obstruction of justice as to constitute a direct contempt of court. 13 C. J. 25, § 31. It is not necessary that the false testimony upon which the charge of contempt is based constitute perjury." Of course, Young v. State, and People ex rel. Nunns v. County Court of Nassau County, supra, were not decisions under the federal contempt statute, but on the question that there may be a contempt of court if the false swearing, though not amounting to perjury, in fact amounts to an obstruction of justice, they are in point. We are satisfied the accusation was sufficient to fully acquaint appellant with the charges against her.

■ The presumption of innocence obtains in a proceeding of this nature and the triers

must be satisfied beyond a reasonable doubt of the guilt of the accused. United States v. Carroll (D. C.) 147 F. 947, 952; Oates v. United States (C. C. A.) 233 F. 201; Kelly v. United States (C. C. A.) 250 F. 947; United States v. Dachis (D. C.) 36 F.(2d) 601; Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Michaelson v. United States, 266 U. S. 42, 45 S. Ct. 18, 69 L. Ed. 162, 35 A. L. R. 451. For acts to be punishable as contempt under section 268, Judicial Code (28 USCA § 385), this court has held in Froelich v. United States, 33 F. (2d) 660 (no question of perjury involved) that it is not necessary they shall have actually obstructed or impeded the administration of justice. If they have a tendency so to do they are sufficient. See, also, Toledo Newspaper Company v. United States, 247 U. S. 421, 38 S. Ct. 560, 62 L. Ed. 1186.

Is there substantial evidence to sustain the finding of the trial court as to criminal contempt?

■■■ When Mrs. Clark received her summons to serve as a juror, she said at her home that she had not wanted to get on the jury but had wanted to be free that week, "absolutely free"; that "I did not know that it was the Foshay jury that I was called for. I did not know that until I got down into the Court room." Her sister, Mrs. Brown, testified at the trial that she had two telephone conversations with her sister after the summons had been served. In the first one Mrs. Clark informed her that she was expecting a visitor for the week of September 1st, and asked if she knew of any way she could get a postponement or get excused. A day or so later Mrs. Brown called her up on the phone telling her she had consulted the Clerk's office as to what she (Mrs. Clark) should do if she wanted to be excused, and that they suggested that she appear in court. Mrs. Brown said:

"I told my sister that I had been to the clerk's office, and that that was what I was told, that she should appear in Court that day if she wanted to be excused or to get a postponement. I said also that she might —that they might not reach her name, because there was such a large panel. I told her then that I had heard that it was to be the Foshay Case. And that that would probably disqualify her. I think that was all. I said I believed that she should see the Court on the day of the summons. * * * I told my sister because of the matter of her employment there, that that would naturally dis-

qualify her. She said it probably would, I believe. When I said it would probably disqualify her, I told her, why, I thought it would probably disqualify her.

"I did not discuss the Foshay Company over the telephone. I knew my sister had been employed there."

Parts of the conversation testified to by Mrs. Brown were not remembered by appellant. The trial court evidently believed Mrs. Brown. Appellant attempted to explain her statement as to not knowing she was called for the Foshay jury until she got into the courtroom, which was directly contrary to the evidence of her sister, by saying her purpose was to shield the person who had given out the information from the clerk's office. At the courthouse on September 1st appellant talked with Mrs. Passer, who had also been called for jury service. The witness testified that Mrs. Clark told her "that she had worked in the Foshay Building, but that she was sure that would not disqualify her for jury service. Mrs. Clark said that she was simply praying to serve as a juror in that particular case. I asked her why she would want to serve on a case that would last so long, and she said that she had a very special reason, but she did not state it. No, she did not state the reason. I told Mrs. Clark that I was very much surprised that we were summoned as jurors in the Foshay Case, because I had not known of it until I arrived in court, and she told me that she knew two weeks before that she was called on the Foshay jury panel." Some of the statements of Mrs. Passer appellant could not remember—some of them she denied. It is argued here by appellant's counsel that Mrs. Passer was a seriously discredited witness, because according to her testimony she and Mrs. Clark discussed the Foshay Case at some length, and when Mrs. Passer was examined she said that she had not mentioned it to a soul. What she testified was that she talked relative to court procedure and did not talk about the Foshay Case. Be that as it may, the trial court evidently thought her credibility was not seriously affected by this.

To Mrs. Johnson, another woman who was summoned for jury service in the Foshay Case, Mrs. Clark, while they were waiting to be called, stated that "she had been a stenographer," and "had done stenographic work for about two weeks for the Foshay Company, since she was married," and "wondered if it would disqualify her."

Mrs. Anderson, who was also a prospec-

tive juror, had some conversation in the courtroom with Mrs. Clark on September 1st. She testified: "Well, I had very little conversation with Mrs. Clark. I only just expressed my opinion, that I really did not know if I would like to serve on a jury of this kind or not, and Mrs. Clark's answer was that she would like to serve, but thought probably she would not be accepted on account of working there. Just working for the parties, working there. That is just what she said. That's all the conversation we had. That was the extent of the whole conservation."

It is apparent that before the examination of Mrs. Clark on the voir dire by Judge Molyneaux she had in her mind the fact that she had been employed by the Foshay Company since her marriage and that such employment might disqualify her. She entered upon the examination with such opinion from her sister. The matter was so much on her mind that she talked to three women who were there awaiting their examination on the voir dire about it, prior to being questioned. She had come to the courtroom with her husband, who, while he was president of the Citizens' State Bank of St. Paul, had done business with Foshay, and also with another of the defendants, Mabry. She had discussed with her husband the possibility of her being on the jury, but said she did not then know it was the Foshay jury. She testified that she was nervous when examined, as might be natural, having been only twice in court before and that a traffic court. However, she was a woman who had had much experience in the business world, i. e., as a stenographer for years, as an assistant cashier for two years, signing drafts and cashier's checks, and at times assisting in the teller's cage, drawing minutes of bank meetings in the bank of which her husband was president, and having charge of the insurance department thereof. She had a high school and business college education. The record shows she was a woman of ability and wide business experience.

The court examined her for the purpose of finding out her connections in any way that might affect her fairness as a juror, so as to give opportunity either for peremptory challenges or challenges for cause. The question to be determined was as to her qualifications to take part in the trial, an exceedingly important question. The court and counsel were entitled to know what her relationship to the entire situation was. She was asked concerning her husband's business and where he had his office. She does not seem to have been frank in telling of her husband's business or place where it was carried on. The court asked her: "Have you yourself ever been in any business of any kind?" That was a clear question sufficient to arouse appellant's attention and direct it to the information sought by the question to be elicited, and required a candid and fair answer. Her answer, "I have been a stenographer before my marriage, yes," was misleading and disarming. The court then asked: "In what kind of business did you work?" And she answered: "Well, I did some banking, and some real estate and insurance, and I was with an automobile concern, with a Nash agency." Her testimony was as misleading as an absolute falsehood, for these two answers taken together conveyed to the court the idea that she had been a stenographer before her marriage and not thereafter; that the employment with the Nash agency had been before her marriage, which was not true; and that these employments represented all the business in which she had ever been engaged. It is contended that she had in mind permanency of employment. If this be true, how did she happen to remember her employment with the Nash agency, which was of no longer duration than her employment with the Foshay Company, and was some time before.

With what possible theory of innocence can the fact be reconciled that she remembered the employment with the Nash agency, which had occurred more than six years before, but forgot the employment with the Foshay Company, which had occurred but a little over two years before, which she as a reasonable human being must have known was so much more material and relevant to the inquiry then proceeding, and about which she had so recently talked in language that bespeaks a complete understanding of its materiality and relevance, with her sister and with three other persons?

It is apparent that she feared her employment with the Foshay Company if known might result in disqualifying her as a juror. If she had been desirous, as she had stated at her home, of not serving on the jury, here was her opportunity to be excused. It is certain from this situation that the thought uppermost in her mind was to conceal the fact that she had been employed with the Foshay Company and thus carry out the wish she had expressed to serve as a juror in this particular case where Foshay and Mabry, business friends of her husband, were defendants. Of course, counsel might have

pursued the matter further and possibly have developed her previous relationship with the Foshay Company, but that is not a defense to her actions.

As to the questions asked her as to whether her mind was open and free and whether she was biased one way or another, which we have heretofore set out, her answers thereto were evidently false, and the record shows she was so deeply prejudiced that she could not fairly serve as a juror. The motive for her prejudice does not appear, but that is immaterial if she had such prejudice and bias that she could not base a verdict upon the evidence and the law. Considering together her statements and conduct prior to her examination by the court and after being sworn as a juror, it is shown we think beyond any reasonable doubt that she had some reason for wanting to become a juror entirely inconsistent with an unprejudiced and unbiased mind and inconsistent with any intention to base her verdict solely upon the evidence and the law as given to her by the court. There is no theory observable to us by which her statements as to freedom from prejudice or bias could be made to appear truthful. Some of the statements alleged to have been made in the examination that was conducted of herself and husband by representatives of the government appellant denies, others she admits, others she does not remember. It is strange that during the time she was being examined for the jury the fact that she had worked for the Foshay Company never came into her mind, and she did not think of it until that evening at the hotel when she seriously wondered, as she testified, if she should not go into court the next day and tell Judge Molyneaux. She says that she went over it and over it. That fact so carefully concealed by her on her examination was disturbing her, but she did not ease her conscience by telling Judge Molyneaux the next day. That her answers as to her employment were merely evasive and not absolute falsehoods is no defense. Evasive answers of a juror on the examination on the voir dire may be just as obstructive to justice as absolutely false answers. Truth is often hidden behind the subterfuge of evasion.

The general rule, and the one followed in the federal courts, is best stated in O'Connell v. United States (C. C. A.) 40 F.(2d) 201, 202, where the defendant was adjudged in contempt "by reason of his attitude as a witness before the grand jury, in not answering or answering evasively questions propounded to him," and where the court said at page 204: "Since Ex parte Hudgings, 249 U. S. 378, 39 S. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333, we have held that, though a witness make formal answer, it may be apparent that he is withholding the truth, and that such obstruction of justice may be punished as contempt even if it be also perjury." In Loubriel v. United States (C. C. A.) 9 F.(2d) 807, though a conviction for contempt was there reversed on the facts, it was said, at page 808: "The question is no less than whether courts must put up with shifts and subterfuges in the place of truth and are powerless to put an end to trifling. They would prove themselves incapable of dealing with actualities if it were so, for there is no surer sign of a feeble and fumbling law than timidity in penetrating the form to the substance. We have not the least doubt of the power of the District Court to punish a witness for an evasion patently put forward to avoid his duty. No doubt, since its exercise is drastic, it is to be used with caution, but at times no other means exist to prevent an entire miscarriage of justice. Of its limitations we shall have more to say."

The case of Pearcy v. Michigan Mut. Life Ins. Co., 111 Ind. 59, 12 N. E. 98, 99, 60 Am. Rep. 673, discusses propositions similar to those before us. The jurors were asked on the voir dire the question: "Do any of you hold a policy of life insurance issued by the defendant, the Michigan Mutual Life Insurance Company?" This juror answered, "No." He had taken out a policy with that company upon his own life payable to his wife, the policy being an old line one in which legal title became vested in a beneficiary. The Supreme Court of Indiana reversed a judgment on the verdict and remanded the case for a new trial, and it said many things. It referred to the twofold purpose of an examination of a juror on his voir dire and the importance of a party knowing the relationship of the person called as a juror to his adversary for the purpose of enabling him to challenge either for cause or possibly peremptorily, and refers to the duty of a juror to fully answer the questions, not concealing any material matter in order that the knowledge may be present to intelligently exercise challenges. The court said:

" * * * A juror who falsely misrepresents his interest or situation, or conceals a material fact relevant to the controversy, is guilty of misconduct, and such misconduct is prejudicial to the party, for it impairs his right to challenge. In this instance the

appellant had a right to a full and truthful answer from Bowman, and it was his duty to make that answer without evasion, equivocation, or concealment.

"We think that the question asked the juror required him to answer as to the policy taken out on his own life for the benefit of his wife. This is our conclusion upon the assumption that the question was that which the appellee maintains it was. It was not incumbent upon the appellee to minutely cover, by a long series of specific questions, all phases of the subject, but it was enough to ask such a question as would indicate to the mind of a fair and reasonable man what information the examining counsel sought to elicit. It seems clear that such a question as that asked Bowman ought to have drawn from him the fact that he had taken out a policy on his own life for the benefit of his wife; for the question certainly indicated that information as to his interest in the company, as well as his connection with it, was sought by the counsel conducting the examination.

"The authorities support our conclusion that if the general question fairly arouses the juror's attention, and directs it to the information desired, it is enough, without specific questions covering minute phases of the subject. * * * But we need not and do not decide whether the interest of Bowman was such as would have warranted a challenge for cause, for it is enough for the present to decide that the information sought by the question was relevant and material for the purpose of enabling the appellant to intelligently exercise her right to interpose a peremptory challenge."

Counsel for appellant in referring to this case points out that the falsification of the juror was not made the basis of a criminal proceeding for contempt, but was merely recognized as a ground for a new trial. That is true. However, the court spoke of the juror as being "guilty of misconduct" and such misconduct as requires a new trial would apparently be an obstruction to the administration of justice. The misconduct in the case we are considering caused some eight weeks of the time of the court, prosecuting officials, and jurors to count for naught.

█ The questions asked appellant on the voir dire as to her employment and her bias or prejudice were highly material. What could be more material to the whole purpose of the voir dire than to seek to ascertain that the prospective juror is free from bias and

prejudice and intends to rest his verdict solely on the evidence and the law as given to him by the court, and to seek out such facts of the juror's business relationships as would bear upon his qualifications as a juror in the particular case about to be tried? Specifically one's employment by the company whose chief members are on trial for frauds committed in the conduct of its business is as material to qualifications as a juror as would be ownership of a policy of life insurance issued by a defendant company. Pearcy v. Michigan Mut. Life Ins. Co., supra. And the fact that the duration of the employment was short, and its character minor, would no more detract from its materiality than would the fact that the insurance policy in the above case may have been of small amount.

█ It is urged with much force that there was no proof of corruption, or of a motive, and that if appellant intended to conceal her employment by the Foshay Company she would not have told that fact to three women in the courtroom just prior to her examination. The latter cuts both ways. She did not attempt to conceal the fact from the three women but carefully concealed it from the court. It is true there is no evidence of corruption, but that is not conclusive, although of course an important fact. It is also true that no real motive for such prejudice has been shown to exist. But her motive for prejudice or bias is immaterial if in fact such prejudice or bias did exist. There might have been no real motive at all, or she might have been endeavoring to protect her husband's business friends, or the only motive might have been a general conviction that all criminal defendants are prosecuted unjustly and should therefore be acquitted; and, if in fact her mind was prejudiced or biased at the time she made the above answers, those answers would have been just as false and obstructive of justice as if she had had the most immediate and real of motives.

We can reach no other conclusion under this record than that there is substantial and sufficient evidence to sustain the finding of the trial court.

█ It is contended that appellant's sworn answer and testimony that she did not intend to mislead the court and that she answered truthfully with respect to her freedom from bias were conclusive. In other words, that the contempt was purged. Such is the common-law rule of trial by compurgation, but this doctrine is a curious legal

antique of past ages. In the present day people are not tried by oath, and this procedure is not the rule of the federal courts. It has been continuously renounced by them, and the sworn answer is not held as conclusive. If a party can purge himself by an answer under oath then as stated in United States v. Shipp, 203 U. S. 563, 27 S. Ct. 165, 167, 51 L. Ed. 319, 8 Ann. Cas. 265, "all contemners willing to run the slight risk of a conviction for perjury can escape."

In Boyd v. Glucklich, 116 F. 131, 142, this court adverted to the common-law rule of purgation in case of a constructive contempt, and seems to have approved it; but in a concurring opinion by Judge Sanborn he took the position, as to proceedings for contempt for disobedience of orders in bankruptcy and in chancery, that: "The sworn answers of the party charged with the contempt are evidence to purge him thereof, but they are not conclusive evidence. They may be contradicted and supported by other testimony, and the question whether or not the party charged has purged himself of the contempt is always to be decided upon a careful consideration of all the evidence produced for and against him." We agree with Judge Sanborn, and if contrary doctrine could be gathered from this case we would not be willing to follow it. In United States v. Shipp, 203 U. S. 563, 27 S. Ct. 165, 167, 51 L. Ed. 319, 8 Ann. Cas. 265, Justice Holmes refers to this doctrine as a notion "an intrusion or perversion of the canon law." In the second appearance of that case in the Supreme Court, 214 U. S. 386, 29 S. Ct. 637, 638, 53 L. Ed. 1041, it was pointed out that in the former appeal it had been determined "that the answers of the defendants, under oath, disavowing intent, did not purge them."

That the federal courts do not recognize the common-law rule of purgation is well settled. They leave the question of the commission of a contempt to be determined by all the proof upon a hearing. United States v. Carroll (D. C.) 147 F. 947; Kirk v. United States (C. C. A.) 192 F. 273; United States v. Huff (D. C.) 206 F. 700; In re La Varre (D. C.) 48 F.(2d) 216; Swepston v. United States (C. C. A.) 251 F. 205; Bowles v. United States (C. C. A.) 50 F.(2d) 848.

We have thus far discussed this appeal on the theory that the evidence of jurors as to what was said by appellant in the jury room was competent evidence. We are now brought to the question of whether appellant was adjudged guilty upon the basis of evidence improperly admitted. This testimony was important as bearing on the motive of appellant in becoming a juror and her condition of mind when she stated that she could try the case without bias or prejudice. There is no doubt that much authority exists for the proposition that a juror cannot be heard to testify to statements made in a jury room by other jurors in the course of the jury's deliberations upon their verdict. The real basis of the doctrine is the principle of privileged communications. Some courts have said it is against public policy to permit a juryman to make an affidavit of anything that occurs in agreeing to a verdict, Woodward v. Leavitt, 107 Mass. 453, 9 Am. Rep. 49, yet courts have not hesitated to set aside verdicts because of the misconduct of jurors, such as a juror bringing law books into the jury room and reading them to the jury upon points involved in the case, Harris v. State, 24 Neb. 803; 40 N. W. 317, and there are numerous instances of where verdicts have been set aside because the jurors agreed to be bound by a quotient verdict. Authority for appellant's position on this question is undoubtedly found in Wigmore's Treatise on Evidence, where he discusses the matter at length, section 2285, vol. 4, p. 3185, and states after reviewing the reasons for surrounding a juror with secrecy: "It has therefore always been assumed and conceded that a juror is privileged not to have his communications with a fellow-juror disclosed upon the witness-stand against his consent." Dean Wigmore draws a distinction between evidence of ordinary acts of misconduct of jurors and utterances, and places the basis of the exclusion of utterances not on the generally stated doctrine of self-stultification but on that of privilege. The states following what Wigmore terms the "Iowa rule" (Wright v. Telegraph Co., 20 Iowa, 195; Cowles v. R. R. Co., 32 Iowa, 515) make no distinction between ordinary acts and utterances. We call attention to a few of these. In Harris v. State, 24 Neb. 803, 40 N. W. 317, 320, there is a most enlightening statement covering very clearly the question we are discussing. It is said: "It is the well-established rule of law, as held in all courts, so far as we know, (unless the rule be changed by statute,) that affidavits of jurors will not be received for the purpose of impeaching or avoiding their verdict in respect to a matter which essentially inheres in the verdict itself, as that the juror was mistaken in a computation, or misunderstood a witness, or did not comprehend the instructions of the court. The reason for the rule is that, the matters referred to being

alone within the breast of each juror, it would be impossible to rebut any statements which might be made by the juror. * * * I think it may further be said that the rule adopted by the greater number of courts, both in this country and in England, is that affidavits of jurors will not be received in any case for the purpose of impeaching or avoiding their verdict; but to this there are a number of exceptions, and, to our mind, the opposite rule is much more reasonable and promotive of justice. This is confined to such overt acts as may be seen or heard, and about which all the jurors present may testify with equal knowledge. Thus, where a verdict for damages is ascertained by aggregation and division, without subsequent ratification; or where it is made to depend upon chance; or where a part of the jury become so intoxicated as to destroy their ability to deliberate and exercise reason and judgment; or where witnesses are surreptitiously called before them, and permitted to detail the principal facts; or where it appears that one of the jurors was familiar with the facts of the case, and by reason of his suppression of the fact of such acquaintance he procures himself to be accepted as a juror, and in the jury-room asserts such knowledge, and assumes the role of both witness and advocate, and procures a verdict; and the like,—all of which, being matters of sight and hearing, are susceptible of proof or contradiction by the testimony of others. In such cases we can see no danger in permitting proof of the facts by the affidavits of the jurors themselves."

In Perry v. Bailey, 12 Kan. 539, it is said by Mr. Justice Brewer: "If the jury have been guilty of no misconduct, no harm has been done by permitting their testimony to be received. If the jury has been guilty of misconduct, but such misconduct was not of such a nature as to prejudice the rights of the parties, the modern rule is to let the verdict stand, and simply punish the offending juror. But if such misconduct has wrought prejudice, not only should the juror be punished, but the verdict also should be set aside."

In Harris v. State, supra, and also in Richards v. State, 36 Neb. 17, 53 N. W. 1027, the misconduct consisted in utterances, but in both cases the testimony was received for the purpose of impeaching the verdict. New York seems to hold similarly in People ex rel. Nunns v. County Court of Nassau County, 188 App. Div. 424, 176 N. Y. S. 858, 862, where the facts are quite similar to the case at bar. There contemnor was a petit juror in a trial upon an indictment against parties

for keeping a disorderly house. The jury acquitted the defendants and contempt proceedings were commenced. In reply to questions put to him on the voir dire, the relator answered that he did not know the defendants or either of them and knew nothing of their place. He was accepted as a juror and sat through the trial. After the case was submitted he stated facts to the jurors, said that he knew the defendants and their place and that it was a correct and proper place. The court held that his answers on the voir dire were false; that his conduct was deliberate in the courtroom and in the jury room; that the proceedings of the jurors preliminary to the verdict, the talk, discussions, informal votes, etc., were inviolable for all time; that such actions inhered in the verdict and were merged in it, but that the conduct of the juror might be in violation of his oath; that this conduct did not "essentially inhere in the verdict itself." The court says:

"I see no justifiable reason, then, for the inclusion of such misconduct—a violation of oath and of function—as within the protection afforded to proper conduct, namely, due deliberations upon the evidence. I cannot see that the jurors would be deterred from full and free performance of their duties, if such misconduct might be brought to light by their testimony. I cannot see that the jurors' discharge of their lawful duties is safeguarded by immunity to one of their number who willfully violates those duties. The honest juror need have no fear of exposure even of his own part, if the principle is confined to its reason. The corrupt juror need have no fear of exposure, if the principle is extended beyond its reason. * * * I perceive no reason why the misconduct should be limited to acts, in contradistinction to words. Words are things, and wrongs may be worked by them. Should drunkenness of a juror be liable to exposure, and words whereby, e. g., a juror should offer $1,000 apiece to his fellows for a verdict for his friend, or should threaten that violence would follow any juror who voted against such friend, be protected, because such words are uttered while the jury are deliberating? There is no tangible proof of either misconduct other than the testimony of the jurors. * * *

"I think there should be no question as to the competency of these jurors as witnesses, when the feature of attack upon the verdict is not in the case. * * *"

It is claimed by appellant that In re Cochran, 237 N. Y. 336, 143 N. E. 212, 213, 32 A. L. R. 433, repudiates People ex rel.

Nunns v. County Court of Nassau County. The finding of the court was that the evidence was insufficient to sustain the charge as appears from its language at page 212 of 143 N. E.: "As to the charges of the first character we do not decide that if he falsely answered the questions of the district attorney whether under oath or not under oath he would be guilty of criminal contempt of court. People ex rel. Nunns v. County Court of Nassau County, 188 App. Div. 424, 176 N. Y. S. 858. We fail to find, however, any evidence whatever from which an inference can be drawn that his answers in this respect were untrue at the time they were made." The conduct in the jury room was not being used for its probative force, but was itself sought to be punished as contempt, and this distinction is most important. The conclusion of the court was: "What we do hold is that no juror may be punished for contempt for his part in any proceedings connected with the rendition of the verdict, because of discussions had, arguments used, statements made, for the reasons given by him for his vote or for the vote itself."

The above case thus in no way repudiated People ex rel. Nunns v. County Court of Nassau County, supra, in which case the juror had not been punished for his conduct in the jury room, but only for his falsification on the voir dire, and in which case the evidence, which included the conduct in the jury room, was thought sufficient proof of the falsification. And the instant case is thus much more closely analogous to People ex rel. Nunns v. County Court of Nassau County, supra, than it is to In re Cochran, supra.

The special divinity which surrounds the deliberations of a jury is only so far as the protection of the verdict is concerned. If one juror should bribe the balance of the jury to return a verdict, would any court assert that there was no power to show this by the statements of another juror as to what the briber had said? If a juror should present to the jury affidavits of alleged facts which should properly have been a matter of testimony, is a court powerless to rectify the wrong which might thus be perpetrated? Must a court sit supinely and spinelessly and permit such misconduct in a juror because of the fine distinction to be drawn that while a court may receive such evidence to show misconduct of a juror in acts, it has no power to do so as to utterances when the acts can only be shown by the utterances? It would carry the doctrine of privilege to absurd results to so hold. We think the whole matter as far as this case is concerned is covered in

McDonald and United States Fidelity & Guaranty Co. v. Pless, 238 U. S. 264, 35 S. Ct. 783, 59 L. Ed. 1300, where the court considered the question as to whether the testimony of a juror could be received to prove misconduct of himself or his colleagues in reaching a verdict. The opinion refers to the fact that the rule on the subject has varied and that a juror's testimony in such cases while sometimes received has always been with great caution. The court says there are only three instances in which the subject has been before it. In United States v. Reid, 12 How. 361, 13 L. Ed. 1023, the question was not decided. In Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917, evidence was received to show that newspaper comments on a pending capital case had been read by the jurors. The court says in McDonald v. Pless, supra, at page 268 of 238 U. S., 35 S. Ct. 783, 785: "Both of those decisions recognize that it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.'" The court recognizes the general rule that the losing party cannot "in order to secure a new trial, use the testimony of jurors to impeach their verdict," but does recognize there are exceptions to the general rule, and further says: "The suggestion that, if this be the true rule, then jurors could not be witnesses in criminal cases, or in contempt proceedings brought to punish the wrongdoers, is without foundation. For the principle is limited to those instances in which a private party seeks to use a juror as a witness to impeach the verdict." This opinion recognizes that there are exceptions to the general rule stated, and that the same is limited "to those instances in which a private party seeks to use a juror as a witness to impeach the verdict." It is true the question of privilege does not seem to have been raised. The court was dealing with misconduct in relation to impeaching the verdict of a jury, and the closing paragraph in the excerpt is significant and fits the situation in this case. See, also, Hyde v. United States, 225 U. S. 347, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614.

There is no question here of impeaching the verdict of a jury. The question is the misconduct of one chosen as a juror. It would seem that if misconduct of a juror in a jury room could be shown by the testimony of other jurors for the purpose of punishing such misconduct, it could be shown for the purpose of its probative force, and that is the

situation here. The testimony admitted of other jurors as to the statements and conduct of appellant in the jury room were admissible as bearing on the question of the falsity of answers given by her on the voir dire examination. No public policy requires the proceedings in the jury room to be kept secret under the circumstances here presented.

Assuming, however, that such testimony should have been excluded, there is exclusive thereof sufficient evidence in this record in our judgment to sustain the finding of the trial court as to criminal contempt. The facts testified to by members of the jury, in brief, were that after the case was submitted appellant announced that as Mr. Horowitz (government's counsel) could not convince her of the guilt of the defendants the other eleven jurors could not do so; that the government's witness Cobel had given perjured testimony in another case, and that she would like to choke him to death; that she had no use for the government because it did not use the soldiers right when they came back from the war; that she would not vote to send seven men to the penitentiary; that Foshay had gone East to secure $18,000,000, but that because of the crash he could not do so; that she desired to consult with her husband and secure his advice on the case.

The fact that immaterial evidence may have been admitted does not necessarily require the reversal of a case where a court sits without a jury as a trier of fact, as there is a presumption that it acts only upon the basis of proper evidence. If there is not sufficient evidence to sustain the trial court if the improper evidence is disregarded, the presumption of course breaks down. In Swepston v. United States (C. C. A.) 251 F. 205, 209, referring to this question, the court said: "It is to be presumed that the court at last considered only the facts and circumstances that were in reality admissible and also calculated to support the judgments claimed; and this was in accord with settled rules of practice in cases tried without a jury." In Sinclair v. United States, 279 U. S. 749, 767, 49 S. Ct. 471, 477, 73 L. Ed. 938, 63 A. L. R. 1258, the court said: "Objections are offered to the admission of certain evidence. In answer, we need only refer to what was said in United States v. King, 7 How. 833, 854, 855 (12 L. Ed. 934): 'In some unimportant particulars, the evidence objected to was not admissible. But where the court decides the fact and the law without the intervention of a jury, the admission of illegal testimony, even if material, is not of itself a ground for reversing

the judgment, nor is it properly the subject of a bill of exceptions. If evidence appears to have been improperly admitted, the appellate court will reject it, and proceed to decide the case as if it was not in the record.'" In Oates v. United States (C. C. A.) 233 F. 201, 205, it is said: "When a judge hears a case without a jury, he is supposed to act only on proper evidence, and if on review it is found that the evidence properly admitted justifies the decree it ought to be affirmed, and if not it ought to be reversed. * * * In all these and many other cases the rule laid down by Chief Justice Marshall in Field v. United States, 9 Pet. 202, 9 L. Ed. 94, has been followed: 'As the cause was * * * not tried by a jury, the exception to the admission of evidence was not properly the subject of a bill of exceptions. But if the District Court improperly admitted the evidence, the only effect would be that this court would reject that evidence, and proceed to decide the cause as if it were not on the record. It would not, however, of itself constitute any ground for a reversal of the judgment.'"

Appellant's brief refers to a statement made on an earlier appeal of Oates v. United States, supra; Id. (C. C. A.) 223 F. 1013, referred to in Gridley v. United States (C. C. A.) 44 F.(2d) 716, 743, as follows: "That a judgment of conviction for contempt should be reversed where incompetent evidence is introduced on the hearing, even where the case is heard by the court, was held in Oates v. United States (C. C. A.) 223 F. 1013, 1014." This was not the holding of the court in the second appeal of the Oates Case, supra. The court evidently on the first appeal thought that the hearsay evidence improperly admitted was essential to the conviction, and it reversed the case. On the second appeal it thought otherwise and affirmed the conviction.

We think appellant has little to complain of as to the admission of the evidence of other jurors, because the record, if such evidence were deleted, is sufficient to sustain the conviction.

Error is claimed in permitting the cross-examination of appellant with respect to what she said and did in the jury room. There is no doubt of the federal rule that in a contempt proceeding a party cannot be compelled on cross-examination to testify against himself, and a defendant who takes the stand in his own behalf can be cross-examined only as to matters elicited in the direct examination. Balliet v. United States (C. C. A.) 129 F. 689; Wilson v. United

States (C. C. A.) 4 F.(2d) 888; Tucker v. United States (C. C. A.) 5 F.(2d) 818; Taylor v. United States (C. C. A.) 19 F.(2d) 813; Madden v. United States (C. C. A.) 20 F.(2d) 289; Fitzpatrick v. United States, 178 U. S. 304, 20 S. Ct. 944, 44 L. Ed. 1078. Here appellant was asked on her direct examination as to her having bias or prejudice, which she denied. This opened the door to cross-examination as to matters which might show the absence of an unprejudiced or unbiased state of mind, and her immunity from self-incrimination was not infringed thereby.

 It is urged there was a denial of due process of law in proceeding to trial on the return day. The rule to show cause was dated November 4, 1931, and served soon thereafter; the marshal's return being filed November 6th. Hearing was set for November 9th. She was apprised by the rule that the trial would be had on November 9th. Counsel for appellant on November 9th requested further time and Judge Nordbye stated that the court would hear the evidence the government desired to present and if any further time were needed for the defense to prepare it would be granted. The government introduced its case and the matter was then continued from November 9th to November 19th. No further requests were made for continuance, and appellant introduced her evidence. We see no reason for any claim that there was any denial of due process of law in forcing her to trial without an opportunity to prepare. Appellant had complete opportunity to prepare her defense and did not ask for more time after the continuance.

 The court imposed on appellant both a fine and imprisonment. The statute provides a punishment by fine *or* imprisonment. Government's counsel claims that there were separate contempts. We think not. The series of alleged false answers were treated as one general contempt of the court. The court did not purport to sentence appellant to imprisonment for one separate act of contempt and a fine for another. So this court could not know which sentence to relieve appellant of should it disagree with the District Court as to the criminal nature of either act. It sentenced the appellant to a fine and imprisonment "as punishment for the contempt of this court of which she has been found guilty." In our judgment there was but one offense and that was evidently the judgment of the District Court. The case must therefore be remanded for resentencing. Wilson v. United States (C. C. A.) 26 F.(2d) 215. Counsel for appellant in the conclusion of his brief states: "A careful analysis of the record leads unerringly to the conclusion that appellant has been punished, not on account of what she said or left unsaid upon her examination as to her qualifications as a juror, but because she voted to acquit in the criminal case."

 It is unthinkable that a court would punish a juror because of a vote for acquittal of a defendant, and it is clear that such was not the case here. It is probable of course that the government would not have investigated the situation if defendants had been convicted, and the facts produced at the hearing would never have been known. While appellant is entitled to a fair trial, the government is also entitled to a fair trial, and there can be no fair trial without an impartial jury. While any attempts to coerce jurors should be condemned, courts are not compelled to sit as mere automatons, powerless to preserve the functions intrusted to them. Appellant is not punished because of her vote for acquittal—she is punished because when called as a juror and examined on the voir dire she deliberately and intentionally misled the court and gave answers, some of which were false and others evasive, the result of which was the obstruction of the administration of justice. The judgment of the court as to the contempt is affirmed, but the sentence is set aside and the case is remanded to the trial court only for the purpose of resentencing.

Remanded.

GARDNER, Circuit Judge (dissenting).

Finding myself unable to agree with my associates, I shall state as briefly as may be the barriers which I am unable to cross. I am not unmindful that a dissenting opinion establishes no legal principle, but it is at least a consolation to the dissenter and a medium of expressing his personal views. In this apologetic frame of mind, and with the deference which is due to the distinguished ability and ingenuity displayed in the majority opinion, I approach the questions involved in this case. To avoid needless repetition, the facts which I shall state will be supplemental only to those disclosed in the majority opinion.

The appellant, Genevieve A. Clark, summoned as a juror, was called for examination on the voir dire, whereupon the court administered to her the usual oath as follows: "You do solemnly swear that you will true answers make to such questions as may be put to you touching upon your qualifications and com-

petency to sit as a juror in this case." She had never served as a juror before. She was then interrogated by the court on the voir dire as follows:

"Q. Genevieve A. Clark, you live at Minneapolis, Minnesota? A. Yes, sir.

"Q. Are you married? A. Yes, sir.

"Q. Have you any children? A. I have two.

"Q. What is your husband's business? A. In the real estate business.

"Q. In what way is he in the real estate business, is he with some firm, or is he by himself? A. He is by himself.

"Q. Does he deal in city property? A. Yes, sir.

"Q. Is he selling property on commission —making a commission? A. Yes, sir.

"Q. Does he have an office? A. Yes, sir.

"Q. Where? A. 417 South Fourth Street.

"Q. How long has he been in the real estate business? A. For about five years.

"Q. Was he in some business before that? A. Well, we were out of the city for two years, when he was not doing anything. Before that, he was in the real estate and insurance business.

"Q. Have you yourself ever been in any business of any kind? A. I have been a stenographer before my marriage, yes.

"Q. In what kind of business did you work? A. Well, I did some banking, and some real estate and insurance, and I was with an automobile concern, with a Nash agency.

"Q. Have you ever read about this case— concerning this case? A. Yes, sir, I have read some of it.

"Q. In what papers? A. The Minneapolis Journal.

"Q. Have you read about it lately? A. I have not read it lately—until just the last day or two.

"Q. Did you talk with people, including your husband, concerning it? A. Yes, sir— pardon me—only with my husband. I have not discussed it with others.

"Q. Only with your husband? A. Yes, sir.

"Q. Was that some time ago, or just lately? A. Just lately.

"Q. Did you discuss it sometime ago at all with your husband? A. I don't remember whether I did or not.

"Q. Well, did he express an opinion to you concerning it—the guilt or innocence of these defendants? A. No, he never has.

."Q. Well, have you expressed an opinion to him? A. No, I feel I have no opinion at all.

"Q. You have formed no opinion? A. No opinion.

"Q. Do you know any of the lawyers in this case? A. No, I do not.

"Q. Or any of the defendants? A. No, I do not.

"Q. Have you ever bought or sold any stock in a corporation? A. No, sir.

"Q. Or any bonds? A. No, sir.

"Q. What schooling have you had? A. High school and business college.

"Q. You took bookkeeping there? A. No, I did not take bookkeeping.

"Q. You did not take bookkeeping? A. No.

"Q. Have you ever had any experience at all in bookkeeping? A. I have never been an actual bookkeeper, but I have had a little bookkeeping experience when I was doing the insurance work. I was not a bookkeeper at the time, but I had access to the books, and occasionally made entries, but that is all.

"Q. Well, do you feel that you are now— that your mind is now open and free, and that you are not biased either one way or the other? A. Yes, I do feel that way.

"Q. Did you ever sit on a jury before? A. No, sir.

"Q. And you think, in the trial of this lawsuit, you could follow the evidence, or would try to follow the evidence, and base your judgment on that and the law as given to you by the Court? A. Yes, I do.

"The Court: Any questions?

"Mr. Horowitz: No questions.

"Mr. Brill: No questions."

The foregoing constitutes the entire examination of this juror and is the basis for this proceeding. She was accepted and served as a juror, and, as noted in the majority opinion, voted to acquit the defendants and persisted in so doing although all the other jurors voted to convict. The jury being unable to agree was discharged by the court, following which the special prosecutor in charge of the prosecution prepared and filed a complaint which is designated "criminal contempt." In this complaint the special prosecutor charged the appellant with perjury substantially as follows: (1) That she falsely stated the nature of her husband's business at the time of her examination; (2)

that she falsely stated the nature of her husband's business some six years and more prior to her examination; (3) that she falsely stated that she did not know any of the defendants in the criminal case; (4) that she falsely stated the nature of her own previous employment; and (5) that she falsely stated that she was unbiased.

On trial the lower court, consisting of two judges neither of whom had sat in the trial of the criminal case, found her not guilty of the first three charges, and, among other things, said that: "In fairness, however, to the defendants in the Foshay case, and their counsel, it should be stated that there is not one scintilla of evidence that would justify a conclusion that any of them had attempted to improperly influence Mrs. Clark." She was found guilty of having falsely stated the nature of her previous employment, and of having falsely stated that she was unbiased.

Before passing to a consideration of the evidence which it is claimed sustains these two charges, a word may properly be said with reference to the nature of the proceeding.

I agree with the majority opinion that the contempt in this case, if any, is a constructive contempt. I also agree that a contempt proceeding is properly referred to as being in its nature sui generis. Within that description, however, proceedings for contempt are of two classes: (1) Those prosecuted to preserve the power and vindicate the dignity of the court, and (2) those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce such rights. Bessette v. Conkey Co., 194 U. S. 324, 24 S. Ct. 665, 48 L. Ed. 997. The contempt here charged is directed against the power and dignity of the court, and hence, is in its nature criminal or quasi criminal. Bessette v. Conkey Co., 194 U. S. 324, 24 S. Ct. 665, 48 L. Ed. 997; New Orleans v. New York Mail S. S. Co., 20 Wall. 387, 22 L. Ed. 354; People v. Stone, 181 Ill. App. 475; Bridges v. State, 9 Okl. Cr. 450, 132 P. 503; In re Kahn et al. (C. C. A.) 204 F. 581; Merchants' Stock, etc., Co. v. Board of Trade of Chicago (C. C. A.) 201 F. 20; In re Rice et al. (C. C.) 181 F. 217; Clay v. Waters (C. C. A.) 178 F. 385, 21 Ann. Cas. 897; In re Nevitt (C. C. A.) 117 F. 448. The proceedings for the punishment of such a contempt should conform as nearly as possible to proceedings in criminal cases. Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 69 L. Ed. 767; Bessette v. Conkey Co., 194 U. S. 324,

24 S. Ct. 665, 48 L. Ed. 997; Anargyros v. Anargyros & Co. (C. C.) 191 F. 208; Nichols v. State, 8 Okl. Cr. 550, 129 P. 673; People v. Stone, 181 Ill. App. 475; Bates' Case, 55 N. H. 325; Ex parte Nelson, 251 Mo. 63, 157 S. W. 794.

The government has recognized the proceedings as being criminal in character, and the special prosecutor in initiating them designated the complaint as "criminal contempt." As in a criminal prosecution, to warrant conviction, a mere preponderance of the evidence is not sufficient, but it must be such as to convince beyond a reasonable doubt of the guilt of the accused. Gompers v. Buck's Stove, etc., Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Hanley v. Pacific Live Stock Co. (C. C. A.) 234 F. 522.

I have referred to the nature of the proceeding because I am impressed with the thought that its character was not appreciated by the trial judges who heard the evidence in this proceeding.

While the defendant was on the witness stand under cross-examination by the special prosecutor, the following proceedings occurred:

"Q. Yes, she was drawn first. Do you remember talking to her?

"Mr. Ueland: This is objected to as not proper cross-examination. I would like to be heard on that objection.

"Judge Nordbye: Oh, I don't think we will just go by the rules of evidence, Mr. Ueland, which we recognize in ordinary matters. Objection overruled.

"Mr. Ueland: Exception."

The trial was conducted under this misapprehension that the defendant was not entitled to invoke the protection of the ordinary rules of evidence, and though the proceeding, as has been noted, was in the nature of a criminal one, the rules of evidence in so far as they were invoked on behalf of the defendant were avowedly brushed aside.

I shall later have occasion again to refer to some of the rulings of the court on the admissibility of evidence. My purpose in making this statement at this point is simply to indicate the conception which the lower court had as to the nature of the proceeding.

But not only did the lower court avowedly disregard the ordinary rules of evidence, but the rules of criminal pleading were so strained as to deprive the appellant of the rights guaranteed her under the Constitution. A glance at the complaint convinces that it

was the intention of the pleader to charge the appellant with a contempt of court by the commission of perjury on the voir dire. This complaint sets out with particularity the administering of the oath by competent authority, the substance of the questions asked, the answers to those questions, and then charges that these answers were false and knowingly false. It sets out what the true answers would have been, and it distinctly alleges willful perjury. Not only does it distinctly allege willful perjury, but it makes no mention whatever of *concealment,* and the complaint closes by alleging that the due administration of justice was thereby corruptly and unlawfully impeded and obstructed. Confessedly, justice might be impeded and obstructed in innumerable ways, and under proper charge might be punished as a contempt, but the particular contemptuous act charged in the complaint in this proceeding was perjury. In the opening paragraph of the lower court's findings, it is recited that the charge was "contempt of court for having committed *perjury* upon her examination as to her qualifications as a juror."

The evidence being confessedly insufficient to sustain the charge of perjury, the lower court took the position that *concealment* could be considered, although it was not mentioned in the complaint, and that it was not necessary that perjury be established. The court, after quoting from Ex parte Hudgings, 249 U. S. 378, 39 S. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333, said: "From this statement, it would appear that untrue answers to questions asked on the voir dire might be of such a character as to obstruct justice and constitute a contempt of court, although the person giving the answers might not be guilty of perjury in the strictest sense."

This, it seems to me, is quite aside from the question. Doubtless the statement is correct, but the authority cited does not sustain the proposition that a party may be charged with being in contempt of court by willful perjury and on trial of such charge be convicted by proof of some other kind of contempt of court.

The statement in the decision of the lower court, to the effect that the information "specifically informed Mrs. Clark that she was guilty of contempt on account of her failure to disclose the fact of her employment with the Foshay Company," is not sustained by the record. She was charged with contempt *not for having concealed, but for having committed perjury.* She was acquitted of perjury, but convicted because she had concealed certain facts, a matter with which she was not charged. So I agree with appellant's counsel that appellant has been convicted of something with which she was not charged in the complaint.

The majority opinion, and the opinion of the lower court, concede that perjury was not established by the testimony. In a case of criminal constructive contempt, the alleged contemner is entitled to all the safeguards imposed by "due process of law." She was entitled to all the protection afforded in cases of indictment, except the right of trial by jury. Certainly, she was entitled to know the nature of the offense. Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 395, 69 L. Ed. 767; Anargyros v. Anargyros & Co. (C. C.) 191 F. 208, 210; Boyd v. Glucklich (C. C. A.) 116 F. 131, 134; In re Clark, 208 Mo. 121, 106 S. W. 990, 15 L. R. A. (N. S.) 389; Ex parte Nelson, 251 Mo. 63, 157 S. W. 794.

In Cooke v. United States, supra, the rule applicable to criminal contempt is thus stated: "Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed."

And in Anargyros v. Anargyros & Co., supra, the court said: "While the nicety and precision of an indictment may not be required, the pleading or affidavit must not only specify clearly the acts which the contemnor will be called upon to meet, but it must quite as clearly, in some form, advise him that the judgment sought against him is one of a punitory character."

The Supreme Court of New Hampshire, in the Bates Case, supra, in an opinion by Chief Justice Foster, said: "It seems to be more appropriate, and at the same time safe enough for the protection of the court, to adhere as closely as possible to the plan and method of criminal procedure, except in the matter of a jury trial. The attachment should be substantially like an indictment, at least to the extent of giving the respondent sufficient information concerning the nature and the particulars of the offence charged; and the rules of evidence and the presumptions of law applied in criminal cases should be observed."

This court, in Boyd v. Glucklich, supra, said: "In proceedings involving the liberty of a citizen, he has a right * * * to be informed of the precise claim against him."

In this case there was no ambiguity in the complaint. It specifically charged a contempt of court by the commission of perjury. There was no occasion for defendant to demand a bill of particulars. Whether or not she had "deliberately and intentionally concealed her employment with the Foshay Company when she was examined by the court" was not charged and was not in issue.

The case was presented in the lower court, both on behalf of the government and on behalf of the defendant, on the theory that if her answers did not constitute perjury as charged, she was entitled to an acquittal. The offense of which she was found guilty was one constructed by the trial court from the evidence and was not charged in the information or complaint. It is stated in the majority opinion that: "The Government here elected to proceed for contempt and not for perjury—doubtless having in mind the difficulty of conviction of perjury." I am unable to find anything in the record to support this statement. The government proceeded against the defendant for perjury, and if any election was made it was by the lower court after the evidence had all been presented and arguments made, and not by the government.

There was a total failure of proof of the charge made against appellant, and finding her guilty of an offense not charged was violative of the fundamental principles of fair play, and resulted in depriving appellant of her liberty and property without due process of law. In sustaining this holding of the lower court, my associates, in my opinion, have fallen into the same error. There was a material and fatal variance between the charge and the proof.

In reviewing the evidence I shall first refer to the charge that the appellant falsely stated the nature of her previous employment.

So far as experience in court was concerned, appellant was a novice. Jury service for a woman in a case so notable as the Foshay criminal case was in the nature of a great adventure, finding no parallel in the background, traditions, or history of her sex; the duty of jury service having but recently been imposed upon women. She was sworn, not as an ordinary witness "to tell the truth, the whole truth, and nothing but the truth," but the oath which she took was a restricted one and obligated her only to make true answers to such questions as might be put to her, touching her qualifications and competency to serve as a juror.

I have set out every question and every answer of her examination. No one ever inquired of her whether she had ever been employed by the defendants, or either of them, nor by the Foshay Company. It is said that she must have had in mind that her temporary employment, which had occurred some two years prior to her examination, would disqualify her to sit as a juror. As a matter of fact, such employment would not, of course, have disqualified her. But even conceding the possibility that she may have had the matter in mind, yet not having been interrogated with reference to it, this may well have disabused her mind of the thought that such employment was a disqualification or even material. She was sworn to answer questions. The questions were propounded by the court, and counsel for either side, including the special prosecutor, were given an opportunity to propound or suggest further interrogatories. Under our practice, even when an ordinary witness is sworn to tell the truth, the whole truth, and nothing but the truth, we still preserve what is thought by trial lawyers to be the almost sacred right of cross-examination. Why is such a procedure preserved? Every lawyer who ever had any experience at all in the trial of lawsuits, knows that it is necessary for the purpose of developing and ascertaining the truth, to cross-examine, and that a witness, though required to tell the whole truth, is not likely even if willing so to do, to be competent to determine all of the facts in his knowledge which may be material or competent; and if a witness makes a voluntary statement not responsive to a question, it is on motion promptly stricken from the record. This appellant, however, though by her oath only required to answer the questions propounded to her, has been convicted of criminal contempt because she did not voluntarily disclose further facts concerning which she was not interrogated. This is applying to the juror, obligated only by a restricted oath, a more strict rule and imposes a higher standard of intelligence, and visits upon her a Draconian severity not applied to any other human being connected with the trial of a lawsuit.

Supposing an ordinary witness were called and examined only by the presiding judge who knows presumably nothing as to what facts the witness may know, and who of necessity is not conversant with either the facts or issues involved in the case. Then let us suppose neither party chooses to examine

the witness, or is prevented by the presiding judge from so doing. It later develops that the witness in fact knew other facts which were material but concerning which he was not interrogated. Would any one contend, or could any court hold the witness guilty of contempt of court? Such a determination by a court would be denounced as arbitrary, tyrannical, and cruel, and yet this appellant has been convicted because she has not made further disclosures about matters concerning which she was not interrogated, though she was obligated by her oath only to answer truly such questions as might be put to her.

The majority opinion fixes a standard of perfection which makes no allowance for the fallibility and frailties of the human intellect. The juror is held bound to know and to disclose all matters which may have any possible bearing upon his fitness or competency to sit as a juror, and this he must do without assistance of either court or counsel under the penalty of being punished for contempt for his failure to disclose some matter which a special prosecutor, failing to secure conviction, may think material to the qualification of the juror. The matter of this employment was, to my mind, of doubtful materiality in view of the finding that the juror knew none of the defendants, the temporary character of the employment, and its remoteness in time. In all the fields of human endeavor, the law neither assumes nor demands the perfect nor the ideal. The perfect and the ideal are abstractions. They are the imaginary standards toward which we strive, but which, confessedly, we never attain. The law, recognizing our limitations, only demands that we approximate the perfect or the ideal, and requires reasonable care, reasonable skill, and reasonable restraints; in fact, in the entire realm of jurisprudence we are governed by the rule of reason. Even in the administration of justice the ideal is not required.

Let us suppose that this juror, instead of standing out against the other jurors, had in fact been an ardent advocate in the jury room for conviction, while certain of the other jurors were for acquittal but finally joined in a verdict of guilty, and defendants' counsel had made application for a new trial on the ground that this juror had not disclosed the fact that she had at one time been employed by the Foshay Company, and that she had willfully concealed this relation from the court. What would then have been the attitude of counsel for the government? Would he not have urged, first, that the matter of employment was entirely immaterial, second,

that the juror had not been asked with reference thereto, though counsel might have interrogated her, and, third, that in view of the finding of no corruption, this attack on the juror's conduct in failing to disclose a remote and casual employment by the Foshay Company, was so entirely wanting in substance as to be frivolous. Certainly, no court would have considered seriously such an application, and yet we are assured that the fact that she voted to acquit, is a matter of no materiality or concern whatever. I concede that it ought not to be, yet in the final analysis I cannot escape the thought that she is being punished for contempt of court because she stood out for acquittal against eleven men convinced of the guilt of the defendants.

It is urged that the testimony of two women summoned as jurors showed that the appellant had in mind that her employment with the Foshay Company might disqualify her as a juror, and further that she was anxious to serve as a juror. The trouble with this testimony is that it proves too much. According to this testimony she said to one woman that she was certain that such employment would not disqualify her, while she is reputed to have said to the other woman that she wondered if it would disqualify her. She denies having had these conversations. One of these women, a Mrs. Passer, testified that Mrs. Clark had said to her that she was simply praying to serve as a juror in that particular case, and that she had a very special reason but did not state it. This witness, after her alleged talk with Mrs. Clark with reference to this case, was herself examined on voir dire as follows:

"Q. Have you ever talked with anyone about the case? A. I have never mentioned it to a soul."

Yet, according to her testimony in this proceeding, she had talked about the case with the appellant and with a Mrs. Johnson. This testimony would seem entirely to negative the theory upon which this conviction is sought to be sustained.

It is urged that she cleverly and cunningly concealed from the court and counsel the fact, which is now magnified into great importance, that she at one time was employed for ten days by the Foshay Company. If she were practicing such cleverness and deceit, she would not have proclaimed to her associates in the court room that she feared her employment might disqualify her, and that she was anxious to serve on the jury. These circumstances are inconsistent with any

such purpose as is now charged against her. As to her alleged desire to serve on the jury, that is a circumstance entirely consistent with her innocence. She may have had a woman's ambition to attain the notoriety of serving on this notable case, and, as before noted, when she was not interrogated with reference to her employment, she may well have concluded that it was such a trivial and immaterial matter that she was not even asked with reference to it. The evidence adduced against her on this charge is purely circumstantial; but the charge, being perjury, could not be established by circumstantial evidence, but must be proved by the sworn testimony of two living witnesses, or one witness and by corroborating circumstances. Hammer v. United States, 271 U. S. 620, 46 S. Ct. 603, 70 L. Ed. 1118; United States v. Wood, 14 Pet. 430, 10 L. Ed. 527; Clayton v. United States (C. C. A.) 284 F. 537; Allen v. United States (C. C. A.) 194 F. 664, 39 L. R. A. (N. S.) 385. To establish guilt of any other criminal offense by circumstantial evidence, the circumstances must not only be consistent with and tend to prove her guilt, but must be inconsistent with any theory of innocence. Spalitto v. United States (C. C. A.) 39 F. (2d) 782; Beck v. United States (C. C. A.) 33 F.(2d) 107; Bishop v. United States (C. C. A.) 16 F.(2d) 410; Colbaugh v. United States (C. C. A.) 15 F.(2d) 929; Salinger v. United States (C. C. A.) 23 F.(2d) 48; Union Pacific Coal Co. v. United States (C. C. A.) 173 F. 737; Van Gorder v. United States (C. C. A.) 21 F.(2d) 939. In view of this rule of law, I am of the view that there is no substantial evidence upon which the conviction in this case can stand.

The examination of this juror on voir dire was confessedly meager, and the result is, in my opinion, due largely to the procedure adopted in the examination of jurors. Counsel for either side should be given ample opportunity, especially in an important criminal case, to make, under the supervision of the court, a searching examination of each juror. Without the privilege of an examination of jurors by counsel on either side other means of ascertaining facts with reference to jurors are resorted to. They are privately investigated by counsel on either side through various channels, which practice may well be looked upon with suspicion because it may result in direct or indirect contact with jurors, whereas, if it be understood that counsel may have the opportunity of thoroughly examining each juror in open court under the supervision of the presiding judge, such situations as are presented in this case would not occur; nor would there be occasion for the practices to which reputable counsel find it necessary to resort in ascertaining, out of court, facts which they deem necessary to know with reference to the jury panel. Gideon v. United States (C. C. A.) 52 F.(2d) 427.

The other charge on which appellant was found guilty is that she falsely stated that she was unbiased. Here again she was specifically and with great particularity and formality charged with perjury. The only direct testimony as to the condition of her mind was her own. She testified that she had no bias or prejudice at the time she was examined as a juror. The charge being perjury, it could only be established by the testimony of two living witnesses, or by one witness and corroborating circumstances, and it could not be established by circumstantial evidence alone. Wigmore on Evidence, §§ 2040–2043; United States v. Wood, 14 Pet. 430, 10 L. Ed. 527; Hammer v. United States, 271 U. S. 620, 46 S. Ct. 603, 70 L. Ed. 1118; Clayton v. United States (C. C. A.) 284 F. 537; Allen v. United States (C. C. A.) 194 F. 664, 39 L. R. A. (N. S.) 385; Sullivan v. United States (C. C. A.) 161 F. 253. The lower court, however, though confessing some difficulty "to ascertain with mathematical certainty the state of her mind when she was examined as a juror," found that the evidence established beyond reasonable doubt that her mind was not at the time free from prejudice and bias. What was the state of her mind *at the time she was examined?* With great deference I pause at the threshold of this inquiry. While we may say with the ancient Greek Philosopher that "The mind is the measure of all things, of things that are, that they are, of things that are not, that they are not," or exclaim with Victor Hugo, "Add, if you can, anything to the human mind!" yet the field of psychological phenomena is a limitless undiscovered realm, which only prophets and oracles of the intellect may venture to explore.

It is here not only necessary to prove beyond reasonable doubt that *at the time appellant was examined* on voir dire she was biased and prejudiced, but it is also necessary to prove beyond a reasonable doubt that she at the time knew that she was biased and prejudiced. Rarely does the individual ever recognize or admit that he is biased or prejudiced or lacking in open-mindedness. The individual generally believes that he is unbiased and unprejudiced, and it is well understood among members of the bar that even the single juror

who hangs a jury is thoroughly convinced that the other eleven members of the jury were biased and prejudiced and lacking in open-mindedness. No one realizes better than the trial lawyer that jurors rarely disqualify themselves upon the ground of bias or prejudice, and in the rare instances when this occurs it is usually because the juror adopts this means of avoiding service on the jury. There is no fixed standard by which it can be determined whether one is biased and prejudiced, and certainly no standard by which the individual may himself determine this condition of mind. In fact, judges are often thought to be biased and prejudiced, but rarely are they conscious of any bias or prejudice, and if interrogated under oath would disclaim any such condition of mind. Only the rarest individual who subjects himself to self-examination is so discerning as to recognize his own prejudices.

The utterances of the accused in the jury room some six or seven weeks subsequent to the time she testified on voir dire are relied upon as establishing perjury in her statement relevant to her condition of mind. These utterances were so remote from the time she testified, and so many things had transpired during this trial which might have changed a perfectly unbiased mind into a biased and prejudiced one, that they lose all probative force and should not have been admitted. At most, these utterances in the jury room might be said to show that her mind was then biased, and her mind being biased at that time proves, or tends to prove, that it was biased at the time of the voir dire. Such reasoning is violative of the principle that one presumption cannot form the basis of another presumption. Brady v. United States (C. C. A.) 24 F.(2d) 399; General Reinsurance Corp. v. Southern Surety Co. (C. C. A.) 27 F.(2d) 265; Lincoln Natl. Life Ins. Co. v. Erickson (C. C. A.) 42 F.(2d) 997.

It must be borne in mind that the judges who sat in the instant proceeding did not sit in the criminal trial and had no personal knowledge of what transpired between the time the juror qualified and the time of her alleged utterances. These utterances are just as consistent with an honest belief based upon the evidence in the case, so far as this record shows, or on incidents that may have occurred during the trial, as they are with the conclusion that she had a biased and prejudiced mind. Certainly, the facts and circumstances proven are not inconsistent with the following theories of appellant's innocence: (1) That she at the time of her examination was in fact unbiased, or, if biased, she was not conscious of it at the time of her examination; (2) that any subsequent statements made by her alleged to indicate bias, were the result of testimony, proceedings, and transactions occurring during the trial, or were the result of her sympathies influenced thereby; and (3) that she voted for an acquittal because she was not convinced that the evidence proved the guilt of the defendants beyond a reasonable doubt, and that in so doing she was responding to her oath as a juror and her own conscience, rather than to some overpowering prejudice or mysterious dominating will.

There being no proof of corruption and no proof of any motive or reason calculated to induce wrongful conduct on her part, the circumstances relied upon fall far short of excluding every other hypothesis except that of guilt, and to my mind do not constitute substantial evidence proving the appellant's guilt beyond a reasonable doubt.

But quite aside from the probative value of the evidence of appellant's utterances during the deliberations of the jury, I am of the view that this testimony was not admissible. It is fundamentally essential to the proper administration of justice that jurors should understand that their deliberations in the jury room are inviolable and that the reason for their verdict cannot be questioned. There are two grounds for this rule. The first may be said to adhere in the integrity of the jury as an institution, and the second is based upon the privilege of the individual juror. In Stephen's History of the Criminal Law of England, volume I, at page 306, the author, in discussing the development of trial by jury, says:

"The right of the jury to return a verdict according to their own consciences, and without being subjected in respect of it to any penal consequences was finally established by Bushell's Case [Vaughan, 135] in the year 1670. In some earlier instances and particularly in the celebrated case of Sir Nicholas Throckmorton in 1554, the jurors were imprisoned and heavily fined for acquitting a prisoner. This, however, was regarded as a great stretch of power even in those days. Sir Thomas Smith says—'if they' (the jury) 'do pronounce not guilty upon the prisoner against whom manifest witness is brought in the prisoner escapeth; but the twelve not only rebuked by the judges but also threatened of punishment, and many times commanded to appear in the Star Chamber or before the Privy Council for the matter. But

this threatening chanceth oftener than the execution thereof, and the twelve answer with most gentle words they did it according to their consciences and pray the judges to be good unto them as they did as they thought right and as they accorded all, and so it passeth away for the most part.' He then refers to cases in which the jurors had been fined—no doubt having in his mind Throckmorton's Case, and adds, 'But these doings were even then of many accounted very violent, tyrannical, and contrary to the liberty and custom of the realm of England.'

"Anciently, it may be, though the contrary seems as probable, jurors who returned a corrupt verdict in criminal cases were liable to what was called an attaint at the suit of the king, though not at the suit of the party. The attaint was a remedy for a corrupt verdict in civil cases, and was tried by a jury of twenty-four, who, if they thought proper, might convict the first jury of a false verdict."

Dean Roscoe Pound, in his book Criminal Justice in America, at page 115, says: "Throughout the seventeenth century the power of juries to render general verdicts was a chief obstacle to the attempts of the crown to use criminal justice for political purposes. When Bushell's Case established that jurors could not be punished for contempt in using this power as their own reasons and consciences dictated, the trial jury seemed to stand first among the common-law bulwarks of individual freedom."

See, also, Woodward v. Leavitt, 107 Mass. 453, 9 Am. Rep. 49; In re Cochran, 237 N. Y. 336, 143 N. E. 212, 213, 32 A. L. R. 433; Jones on Evidence (2d Ed.) § 2212; Wigmore on Evidence, §§ 2346–2354; Hyde v. United States, 225 U. S. 347, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614.

But it is said in the majority opinion that this proceeding is not for the purpose of punishing the juror for anything that she may have said or done during the deliberations of the jury, but for having falsely stated her state of mind at the time of her examination on the voir dire. In a qualified way this is correct, but having in mind the purpose and reason for the rule and the history and traditions upon which the rule is based, the distinction, it seems to me, is one going to form rather than to substance or principle. If the freedom and independence of the jury and the secrecy of their proceedings are to be maintained inviolate, then that principle is violated by permitting other jurors to disclose the proceedings of the jury on the prosecution of a juror for contempt

for having falsely testified on his examination on voir dire. The result is the same. If, when a juror is unfortunate enough to be in the minority, and we may assume that at least until the final vote no juror will know whether that is to be his status or not, he must act under restraint because he may later be prosecuted for having falsely stated his state of mind, then the freedom of expression in the jury room and the independence of the jurors will have been destroyed quite as effectively as if during their deliberations they are under the restraint of a possible prosecution for misconduct in their discussions and deliberations. The reason for the rule excluding such testimony is quite as cogent as where it is sought to punish the juror for utterances and arguments in the jury room. Jurors must, if the system is to be maintained, be exempt from the liability of being questioned as to their motives and grounds of action while acting as jurors. The language of the Supreme Court in Sinclair v. United States, 279 U. S. 749, 49 S. Ct. 471, 476, 73 L. Ed. 938, 63 A. L. R. 1258, is significant. It is there said: "If those fit for juries understand that they may be freely subjected to treatment like that here disclosed, they will either shun the burdens of the service or perform it with disquiet and disgust."

Mr. Hughes, in his Work on Evidence, at page 302, says: "On the ground of public policy, freedom of expression in the jury room is absolutely essential. It follows, therefore, that the rule of privilege is applicable in the full sense of the term to the deliberations of petit jurors."

Mr. Jones, in his Commentaries on Evidence, section 2212, says: "It is essential to the due administration of justice that jurors should understand that their deliberations in the jury room are inviolable, and that the reasons for their verdict cannot be questioned."

The Court of Appeals of New York, in Re Cochran, supra, in an opinion by Mr. Justice Andrews, says: "It is not alone as to the final result—the verdict—that they [jury] are protected. Public policy requires that they be given the utmost freedom of debate as it requires it in the case of the Legislature."

Underhill on Criminal Evidence (3d Ed.) at section 311, states the rule as follows: "As regards traverse jurors the rule seems now to be that they may testify only to facts or communications referring to their actions as individuals while separated from their associates. They may testify to what third persons said or did to them as individual jurors.

But the motives and reasons of the jury and the transactions and communications referring to the subject-matter under their consideration as an official body, and which were made in their capacity as jurors, are privileged, whether made in the jury room or elsewhere. Evidence from the jurors to show their ignorance, or misconduct, or to impeach their verdict for the purpose of obtaining a new trial, cannot be received. The admission of such evidence is contrary to public policy and injurious to the administration of justice."

Mr. Wigmore, in his Work on Evidence, at section 2346, among other things says: "Under the parol evidence rule, the juror's testimony is excluded only when it is offered to prove facts nullifying the verdict, on a motion for a new trial. But under the privileged communications rule, the juror's testimony would be excluded for any purpose whatever,—for example, where upon another trial he was a witness and his bias was offered to be shown by his expressions during retirement with the former jury. Thus the genuine privilege may have a larger scope than the parol evidence rule."

Neither is there anything in the dictum in McDonald v. Pless, 238 U. S. 264, 35 S. Ct. 783, 59 L. Ed. 1300, referred to in the majority opinion, inconsistent with the rule stated by the above authorities. The question in that case was whether misconduct in the jury room might be shown in cases where no attempt was made to impeach the verdict, and the question of privilege was not considered by the Supreme Court. In the instant proceeding the question is whether what was said by the juror in the jury room could be used against her to prove an alleged wrongful act committed at some other time and place.

The proceeding sanctioned by the majority opinion in the instant case will go far to undermine the independence and freedom of the jury.

This testimony was also inadmissible because it was privileged. The majority opinion, by way of illustration, gives instances of acts of jurors which should be subject to punishment. Confessedly, not all the acts of a juror are privileged. Those acts which do not adhere in the verdict, but which are ministerial, are not privileged. This is pointed out in Re Cochran, supra, where it is said:

"In Bushell's Case the distinction was clearly drawn between two kinds of misconduct, a breach of their ministerial duty and of their judicial. Probably a juror who concealed a reporter in the jury room might be held guilty of contempt as would be the reporter himself; or a juror who smuggled in intoxicating liquor and consumed it, or induced his fellows to do so. * * *

"In the case before us each one of the alleged second class of offenses relates to arguments claimed to have been made in bad faith; statements of fact said to be false, and votes as to the verdict said to be knowingly perverse. Admitting all that is claimed, there is no basis for a finding that Cochran was guilty of criminal contempt. If in any of these respects he was guilty of corrupt conduct, the only remedy is by indictment and by trial before a jury."

Finally it is said in the majority opinion that the fact that immaterial evidence may have been admitted does not necessarily require a reversal of the case where the court sits without a jury, because there is a presumption that it acts only on the basis of proper evidence. There are two answers to this suggestion: First, if this evidence be excluded, there is no substantial evidence to sustain the judgment of the trial court, and the evidence is not only immaterial but is incompetent; and, second, that while it will ordinarily be presumed that the court sitting without a jury considers only the material and competent evidence, yet this is only a presumption, and it affirmatively appears in this case that the court did consider and did rely upon this very evidence. In the opinion of the trial court it is said: "During the deliberations of the jury, after the case was finally submitted, she announced that, since Mr. Horowitz had been unable to convince her of the guilt of the defendants, the other jurors could hardly expect to do so. She virtually closed her ears to the arguments of other jurors, and made a statement with respect to the government witness Cobel, the effect of which was to charge him with having given perjured testimony in a case in the South in an attempt to convict an innocent man. * * * Mrs. Clark, during the deliberations of the jury, expressed a wish that she might consult with her husband and secure his advice. She also made statements to the effect that she could not vote to send seven men to the penitentiary. The jury were out for approximately one week, and stood eleven for conviction, and one (Mrs. Clark) for acquittal." In another part of the opinion the court refers to the appellant's "unyielding attitude" in the jury room.

This conclusively shows that the trial court did not disregard nor exclude this incompetent evidence, and it is elementary that

when facts appear presumptions vanish. A presumption cannot be weighed in the balance as against facts. United States v. Le-Due (C. C. A.) 48 F.(2d) 789; Guaranty Trust Co. v. Minneapolis & St. L. R. Co. (C. C. A.) 36 F.(2d) 747; Fidelity & Casualty Co. v. Niemann (C. C. A.) 47 F.(2d) 1056.

It is a well-established and oft-repeated rule that the power to punish for contempt of court should be used sparingly and with great caution and deliberation. Gompers v. Buck's Stove, etc., Co., 221 U. S. 418, 31 S. Ct. 492, 502, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 396, 69 L. Ed. 767; Boyd v. Glucklich (C. C. A.) 116 F. 131.

In Gompers v. Buck's Stove, etc., Co., supra, the Supreme Court said: "But the very amplitude of the power is a warning to use it with discretion, and a command never to exert it where it is not necessary or proper."

In Cooke v. United States, supra, the court said: "But its exercise is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions."

The power to punish for contempt should be used sparingly and with great caution, and after all, the authority, majesty, and dignity of the court and the respect which it may command depend more on the righteousness of its judgments than on the exercise of its power to punish for contempt.

Other questions involved invite discussion, but this opinion has already been unduly extended.

There is so much uncertainty and doubt as to the guilt of the appellant, and so much doubt as to the regularity of the proceedings leading up to her conviction, that I am impelled to the view that the judgment of the lower court should be reversed and the cause remanded for further proceedings.